LOCAL 2677, the AMERICAN FEDERA-
TION OF GOVERNMENT EM-
PLOYEES, et al., Plaintiffs,

v.

Howard J. PHILLIPS, both Individually
and in his capacity as Acting Director,
Office of Economic Opportunity, De-
fendant.

WEST CENTRAL MISSOURI RURAL
DEVELOPMENT CORP. et al.,
Plaintiffs,

v.

Howard PHILLIPS, Individually and as
Acting Director, Office of Economic
Opportunity, Defendant.

NATIONAL COUNCIL OF O.E.O. LO-
CALS, A.F.G.E., AFL–CIO, et al.,
Plaintiffs,

v.

Howard J. PHILLIPS, Acting Director of
the Office of Economic Opportu-
nity, et al., Defendants.

Civ. A. Nos. 371–73, 375–73 and
379–73.

United States District Court,
District of Columbia.

April 11, 1973.

Glenn R. Graves, John W. Karr, Washington, D. C., for plaintiffs in Local 2677.

John M. Ferren, Allen R. Snyder, Henry Polmer, Washington, D. C., Sarah C. Carey, Harold Himmelman, National Lawyers' Committee for Civil Rights Under Law, Washington, D. C., for plaintiffs in West Central.

Thomas P. Powers, Washington, D. C., Davis, Miner, Barnhill & Bronner, Philip B. Kurland, Chicago, Ill., for plaintiffs in National Council.

Harlington Wood, Jr., Asst. Atty. Gen., Harland F. Leathers, Robert E. Washburn, John M. Kelson, Attys. Dept. of Justice, Harold H. Titus, Jr., U. S. Atty., Arnold F. Aikens, Robert S. Rankin, Jr., Asst. U. S. Attys., Washington, D. C., for defendants.

## OPINION

WILLIAM B. JONES, District Judge.

These three consolidated actions have been brought to declare unlawful and enjoin what the plaintiffs alleged to be the unlawful dismantlement of the Office of Economic Opportunity (OEO) by the de-

fendant, Howard J. Phillips, Acting Director of OEO. The plaintiffs in Local 2677, American Federation of Government Employees, et al. v. Phillips, Civil Action No. 371–73 (hereinafter *Local 2677*), by an amended complaint, are the labor organization-bargaining agent for the Washington, D. C. headquarters employees of OEO, and two individual OEO headquarters employees. Suit is brought on behalf of all OEO employees throughout the country who have been or are about to be adversely affected by the alleged unlawful acts of the defendant. The plaintiffs in West Central Missouri Rural Development Corp., et al. v. Phillips, Civil Action No. 375–73 (hereinafter *West Central*), are four Community Action Agencies (CAAs) as designated pursuant to 42 U.S.C. § 2790 (1970), which bring their suit on behalf of all 930 CAAs receiving funds from OEO under section 221 of the Economic Opportunity Act of 1964, as amended, 42 U.S.C. § 2808 (1970). In the third suit, National Council of O.E.O. Locals, A.F. G.E., AFL-CIO, et al. v. Phillips, et al., Civil Action No. 379–73 (hereinafter *National Council*), the plaintiffs are the exclusive agency-wide representative for all nonsupervisory OEO employees, an association of CAA executive directors, three CAAs, two headquarters employees of OEO, several CAA employees, and several beneficiaries of programs funded by OEO through CAAs. National Council is likewise brought as a class action on behalf of all OEO employees, all CAAs and their employees, and all beneficiaries of CAA programs.[1] Jurisdiction is based on 28 U.S.C. §§ 1331, 1343, 1361 and 2201–2202 (1970), as well as for review of administrative action under 5 U.S.C. §§ 701–706 (1970).

At a hearing on March 2, 1973, the Court granted the defendant's uncontested motion for consolidation and allowed the plaintiffs certain limited expedited discovery of Phillips by interrogatories and set a timetable for the filing of motions. At that time the defendant filed an affidavit indicating his intention not to take any action, prior to March 15, 1973, relating to transferring or discontinuing any OEO program which would finally and irrevocably adversely affect the rights of OEO employees. The terms of that affidavit were extended to March 23, 1973, at the Court's request. Subsequently, on March 7, 1973, the application for a temporary restraining order in *Local 2677* was argued and denied. The case is now before the Court on the plaintiffs'[2] motions for preliminary injunction, the defendant's motion to dismiss or in the alternative for summary judgment, and the plaintiffs' cross-motions for summary judgment, which supercede and incorporate the prior motions for preliminary injunction.

The plaintiffs' statements of material facts as to which there is no genuine dispute, filed in accordance with Local Rule 9(h), have not been controverted by the defendant, except as they may contain legal conclusions. Those material facts in turn are merely an elaboration of the Rule 9(h) statement submitted by the defendant, and thus the Court finds that there are no material facts in dispute and the case is ripe for summary judgment.

On March 20, 1973, two days before the oral hearing in this case, the plaintiffs in *National Council* moved to voluntarily dismiss their suit under Fed.R.Civ.P. 41(a) so that they could join in a similar suit brought by other parties in the United States District Court for the Northern District of Illinois. Dismissal under Rule 41(a)(1) would not be proper because of the class nature of the suit and the filing of a

---

1. The complaint in *National Council* also names Roy L. Ash, Director of the Office of Management and Budget, as a defendant. Because the essential allegations in the consolidated cases go to the actions of defendant Phillips, the defend-

ants will be referred to collectively as defendant or Phillips.

2. References to plaintiffs will hereinafter include the plaintiffs in all three cases unless otherwise specified.

motion for summary judgment by the defendant. The Court, in the exercise of its discretion under Rule 41(a)(2), will refuse to grant the voluntary dismissal. Although the Court is aware of the alleged financial burden of pursuing this action further, the motion for dismissal was not filed until the case was ready for final disposition by summary judgment. Dismissal at this time, especially of a class action, would not best facilitate the orderly and swift administration of justice.[3]

Consideration was also given at oral argument to transferring *National Council* to the Northern District of Illinois for possible consolidation with the suit plaintiffs sought to join there. The defendant's counsel objected, noting that argument was scheduled for four days later on the motion for preliminary injunction in that suit. In view of that circumstance, the Court decided that a transfer would be untimely.

### Statement of the Case

The plaintiffs assert that the defendant has been acting illegally for several reasons. It is sufficient for the disposition of these cases to consider only three of their contentions. First, the plaintiffs claim that the Economic Opportunity Amendments of 1972 (hereinafter 1972 Amendments), Pub.L. No. 92–424, 86 Stat. 688 (1972), in particular sections 2(a), 3(c)(2), and 28, forbid the defendant from taking the actions he has to terminate OEO funding of CAAs. Second, the claim is made that the activities of the defendant regarding the alleged termination of CAA functions is an illegal reorganization because the terms of the Reorganization Act, 5 U.S.C. §§ 901–913 (1970) have not been complied with. Finally, the plaintiffs contend that the defendant's directives are illegal and of no effect because he failed to publish them in the Federal Register as required by section 22 of the 1972 Amendments, 42 U.S.C.A. § 2971b. The defendant has raised several technical defenses in addition to his defenses on the merits. The Court finds against the defendant on these points for reasons set forth below.

The Court finds for the plaintiffs on all three of these basic substantive theories.

### Case or Controversy

The defendant argues that these cases are brought prematurely and thus fail to present a justiciable case or controversy. An examination of the uncontroverted facts reveals that this contention is totally unfounded and that the present cases present a justiciable case or controversy.

On January 29, 1973, President Nixon submitted his 1974 Budget Message to Congress. That budget message set forth the administration's plan to transfer responsibility for certain OEO functions to other agencies. The message specifically notes that

> No funds are requested for . . . [OEO] for 1974. Effective July 1, 1973, new funding for . . . [CAAs] will be at the discretion of local communities. . . . With Community Action concepts now incorporated into ongoing programs and local agencies [if the budget proposals are approved], the continued existence of OEO as a separate Federal agency is no longer necessary.[4]

The defendant has attached this excerpt from the budget message to his affidavit filed in support of his motion for summary judgment as an indication of the plan he is pursing as Acting Director of OEO.

On January 29, 1973, the defendant issued a memorandum to all OEO regional offices, attached as Exhibit A to

---

3. *See generally* Note, Voluntary Dismissal by Order of Court-Federal Rules of Civil Procedure Rule 41(a)(2) and Judicial Discretion, 48 Notre Dame Law. 446 (1972).

4. The Budget of the United States Government, Fiscal Year 1974 at 122.

the complaint in *West Central*, regarding the "termination of section 221 [CAA] funding." That memorandum, at page two, further noted that the cessation of funding would rescind individual designations as CAAs. OEO Instruction 6730–3, issued March 15, 1973, at page two, repeats the same instruction of the defendant that CAA funding will cease and further warns that use of funds by a CAA for any purpose except phasing out its activity or the failure of a CAA to submit an "acceptable" phase-out plan 120 days prior to the termination of section 221 funding will result in summary suspension of OEO funds. The same Instruction 6730–3 sets out 21 pages of guidelines for CAAs to follow in shutting down their section 221 operations, with various deadlines to be met throughout that process.

Thus, as stated in the uncontroverted *West Central* statement of material facts not in issue, all program evaluations and processing of CAA applications for purposes other than phasing out CAA activities have stopped. CAAs have been instructed to stop purchasing or repairing essential equipment. The day-to-day business operations of CAAs have been hindered if not halted by the unwillingness of third parties to deal with CAAs because of the announcement by the defendant of the termination of funding. The orderly continuation of CAA functions, discussed in more detail *infra*, has been halted or severely disrupted by the requirements imposed by OEO regarding termination. Finally, CAA employees are leaving their jobs in anticipation of the cessation of funding in compliance with OEO directives.

The defendant asserts that the complaint of the plaintiffs is premature because the defendant's compliance with his statutory duties regarding CAAs cannot be determined until June 30, 1973. The basic theory underlying this assertion is that until that time the defendant will be in compliance with all applicable statutes because the OEO's CAA function will not cease before that date and because he will reserve and make available for obligation to CAAs in fiscal year 1973 the $328,900,000 mandated by section 3(c)(2) of the 1972 Amendments.[5]

■■ Article III of the Constitution does limit the jurisdiction of this Court to actual cases or controversies, and forbids the adjudication of hypothetical questions upon which the Court would render only an advisory opinion. Golden v. Zwickler, 394 U.S. 103, 108, 110, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). A case or controversy in the constitutional sense "must be definite and concrete, touching the legal relations of parties having adverse legal interests." Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240–241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). In the absence of an immediate adverse effect on parties in a concrete situation, a dispute is too hypothetical for the proper exercise of the judicial function. Longshoremen's Union v. Boyd, 347 U.S. 222, 223–224, 74 S.Ct. 447, 98 L.Ed. 650 (1954).

■ The application of these general principles to the instant suit demonstrates that it readily meets the case or controversy requirement. The plaintiffs are challenging the current practices of the defendant as they affect the day-to-day operations of the CAAs. There is no doubt but that the directives of the defendant, in requiring the CAAs to phase

---

5. Sec. 3(c)(2), Pub.L.No. 92–424, 86 Stat. 688 (1972), reads in pertinent part:

Notwithstanding any other provision of law, unless expressly in limitation of the provisions of this section, of the amounts appropriated . . . for the fiscal year ending June 30, 1973, and for the succeeding fiscal year, the Director of the Office of Economic Opportunity shall for each such fiscal year reserve and make available not less than $328,900,000 for programs under section 221 of the Economic Opportunity Act of 1964. . . .

The plaintiffs no longer question the defendant's assertion that he has complied with his duty to reserve and make available those funds to CAAs, although not necessarily for programs under section 221.

out their operations and in setting a timetable for that purpose, have presented a judicially cognizable controversy that is having severe, intended, and immediate adverse consequences upon all the class plaintiffs in these suits. Moreover, the defendant has announced in Instruction 6730–3 that each CAA must decide by June 30, 1973, whether to continue in existence and notify OEO of that decision.

■■ In determining whether a dispute has matured to the point at which it becomes a case or controversy, a court may look to the announced intentions of the defendant to take adverse action against a plaintiff. Younger v. Harris, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L. Ed.2d 669 (1971). If a plaintiff is "either presently or prospectively subject to the regulations, proscriptions, or compulsions that he . . . [is] challenging," then he has presented a case or controversy for judicial resolution. Laird v. Tatum, 408 U.S. 1, 11, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972). The plaintiffs here are subject to both presently effective orders and those which require them to take action in the future which they challenge as unlawful. The defendant has left no doubt of his intention to act in accord with those orders.

■ Surely it cannot be maintained that the plaintiffs must wait until the CAAs have gone out of existence before they may challenge acts of the defendant which they claim are illegal. Courts do not require that an injury be complete before they will adjudicate the issues. The present case is no abstract disagreement over policies which have not as yet affected the plaintiffs in a concrete way. The controversy is so concrete that a delay in judicial consideration would work extreme hardship on the plaintiffs. *Cf.* National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689 (1971).

In rebuttal the defendant argues that no case or controversy can exist until Congress appropriates money for OEO

to operate in fiscal 1974. The plaintiffs, however, do not argue that OEO must spend new funds in fiscal year 1974 which have not been appropriated. Rather they challenge as unlawful the current and announced practices of the defendant as they affect the plaintiffs today, even though those practices will affect them as well after June 30, 1973. In that context, this case is justiciable.

### *Political Question*

■ The defendant contends further that this case is not justiciable because it involves a political question. That theory is bottomed on the assumption that what the plaintiffs really ask of this Court is for it to interject itself between the Executive and Legislative branches of the federal government regarding the Executive budget proposals for OEO for fiscal year 1974. If that were the circumstance, the defendant would clearly be correct. But the Court holds that not to be the circumstance and that this case does not present a nonjusticiable political question.

As will be elaborated in the discussion of the merits of this case, the plaintiffs are challenging the defendant's exercise of his statutory powers as Acting Director of OEO as unlawful and in direct violation of certain statutory obligations. The plaintiffs do not seek to force Congress to appropriate any funds or to require the defendant to spend any funds which have not been appropriated. Rather they seek to enjoin the defendant from acting in a manner other than that consistent with laws already passed by the Congress and signed by the President. It is their contention that Congress has already spoken through law on the manner in which the OEO, and in particular the CAA program of OEO, must be operated and that the defendant is acting contrary to that mandate.

Therefore this dispute is one which readily is within the judicial power. It is the type of case which the federal courts regularly encounter and decide. *See, e. g.,* Ringer v. Mumford, 355 F. Supp. 749 (D.D.C.1973). Thus there is

no problem with formulating "judicially discoverable and manageable standards for resolving" the dispute. Powell v. McCormack, 395 U.S. 486, 518, 89 S.Ct. 1944, 1962, 23 L.Ed.2d 491 (1969), quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Briefly, the Court must determine whether an executive official is following the explicit mandates of the Congress and the Constitution, which is the judicial function in our tripartite government. Baker v. Carr, *supra*, at 211, 82 S.Ct. 691. *Cf.* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

No problem of a clear textual commitment to another branch of government of the matter under consideration here is present. Powell v. McCormack, *supra*, 395 U.S. at 518, 89 S.Ct. 1944; Baker v. Carr, *supra*, 369 U.S. at 211, 217, 82 S. Ct. 691. The textual commitment most apposite to the instant case is that of the President under Article II, section 3, of the Constitution to "take Care that the Laws be faithfully executed." The plaintiffs claim that the defendant, an executive official, is in violation of his duties under 42 U.S.C. § 2808 (1970) to implement the Economic Opportunity Act, in particular as last amended by the Congress. No nonjusticiable political question is presented in this case.

### Sovereign Immunity

The defendant argues that in reality these are unconsented suits against the United States which must be dismissed because of sovereign immunity. In support of this theory, it is contended that enjoining the defendant would be a judgment which would draw upon the Treasury because it would require the expenditure of funds not yet appropriated, and further that it would interfere with the public administration of the laws. Thus the well known rule that a suit nominally against a government official is in actuality an unconsented suit against the United States would require dismissal. Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947).

The defendant would be right if the characterization of the issues were correct. But this argument proceeds on a fundamentally incorrect premise. The relief which the plaintiffs seek would not be a drain on the public purse. No injunction to spend unappropriated funds is sought. What the plaintiffs do demand is that the defendant be enjoined from acting in a manner which violates his statutory duties under the Economic Opportunity Act or that he be declared to be acting unconstitutionally. Thus this suit clearly falls within the exception to the doctrine of sovereign immunity which allows suits against federal officials who have allegedly acted beyond their statutory powers or have exercised their statutory powers in a constitutionally void manner. Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Larson v. Domestic & Foreign Corp., 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).[6] Even though a judgment of this Court will require that funds be expended in its implementation, there is no draw upon the public treasury. It is undisputed that Congress has appropriated monies for the operation of OEO through June 30, 1973. Pub.L. No. 92–607, 86 Stat. 1503. Therefore any order

---

6. At oral argument on the cross-motions for summary judgment, counsel for the defendant contended that any relief entered against defendant would be affirmative in nature and violative of the dictum of Larson v. Domestic & Foreign Corp., 337 U.S. 682, 691 n. 11, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), questioning the availability of such relief. Transcript at 27–28. Although the dictum of *Larson* has not been followed universally, *see* Rockbridge v. Lincoln, 449 F.2d 567, 573 (9th Cir. 1971), there is no need to reach that issue in the present case. First, the relief sought is not affirmative. The plaintiffs seek to enjoin the defendant from failing to carry out his statutory obligations. *Cf.* East Oakland-Fruitvale Planning Council v. Rumsfeld, 471 F.2d 524, 530 n. 5 (9th Cir. 1972). Second, as is discussed *infra*, sovereign immunity has been waived not only through the allegation of illegal official action, but also through the Administrative Procedure Act. Section 706 of that Act authorizes affirmative relief to be granted.

of this Court requiring the defendant to act in accordance with the mandate of Congress would draw upon funds appropriated for that purpose.

 Sovereign immunity has also been waived in a second manner. Jurisdiction in this suit is partially based on the review of administrative action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1970). In cases in which the Administrative Procedure Act is applicable, it is the law of this Circuit that that Act serves as a waiver of sovereign immunity. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 385, 424 F.2d 859, 873 (1970); Constructores Civiles de Centroamerica, S.A. v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972). As the Court of Appeals recently held in Knox Hill Tenant Council v. Washington, 145 U.S.App.D.C. 122, 129, 448 F.2d 1045, 1052 (1971):

> There is nothing new about judicial entertainment of suits which charge that federal officials are acting outside of, or in conflict with, the responsibilities laid upon them by the Congress or the Constitution. Whether such charges are true, and, if so, what remedial action the court should or may direct, are questions partaking of the merits, and not of jurisdiction to explore the merits. (Footnote omitted.)

Thus this Court has jurisdiction to interfere with the public administration in cases in which it is charged that the administrator has violated his statutory and constitutional responsibilities.

### Standing in Local 2677 and National Council

 The plaintiff OEO employees in Local 2677 and National Council complain of the defendant's actions in terminating CAA funding and functions as an unlawful exercise of his statutory powers as Acting Director of OEO and as violative of the Reorganization Act, 5 U.S.C. §§ 901–913 (1970). They argue that the abolition of OEO itself, the avowed goal of the defendant, see supra will adversely affect them in that they will be and are losing their jobs either through reductions in force or outright firings. The defendant argues that the unions lack standing to assert these claims on behalf of their employees and that, in any event, they have failed to exhaust their administrative remedies and thus are precluded from bringing suit at this time. These contentions are without merit and the Court finds that the union plaintiffs in Local 2677 and National Council have standing and are not barred by the doctrine of exhaustion of remedies.

No general discussion of the evolving law of standing is needed to demonstrate that the union plaintiffs have asserted the required claim of injury in fact to an interest arguably within the zone of interests to be protected or regulated by the statutes which they claim the defendant is not carrying out. See Sierra Club v. Morton, 405 U.S. 727, 733, 92 S. Ct. 1361, 31 L.Ed.2d 636 (1972). The loss of jobs is certainly a claim of injury in fact. Although the union plaintiffs may not be the primary intended beneficiaries of the statutes which they claim the defendant's actions violate, they need only be intended beneficiaries to have standing. Constructores Civiles de Centroamerica, S.A. v. Hannah, 148 U.S.App.D.C. 159, 165, 459 F.2d 1183, 1189 (1972); Peoples v. United States Department of Agriculture, 138 U.S.App. D.C. 291, 293, 427 F.2d 561, 563 (1970). The plaintiffs' interest in continued employment is one that the statutory and constitutional provisions which they claim are being violated were intended to protect.

This case is strikingly analogous to Lodge 1858, A.F.G.E. v. Paine, 141 U.S. App.D.C. 152, 436 F.2d 882 (1970). In Lodge 1858 the Court of Appeals held that civil service employees of the National Aeronautical and Space Administration (NASA) through their union had standing to contest as violative of a statute the action of the NASA administrator in hiring outside workers at a federal installation. The statute placed

specific limitations on the administrator in using outside workers. The situation is the same in the instant case. The union plaintiffs assert that their members will lose their jobs because their administrator, the defendant, is acting outside the scope of his statutory authority.

*Lodge 1858* also dictates that this case not be dismissed for failure to exhaust administrative remedies. The exhaustion requirement contemplates an effective remedy before it comes into play. In *Lodge 1858*, the employees could not challenge the statutory validity of the outside contracts in a civil service proceeding and thus it would have been futile to require them to exhaust that "remedy" before challenging the administrator's action in court. In the present case, it would likewise be outside the scope of civil service authority to determine whether the defendant was acting within his statutory duties in terminating the CAA function of OEO and OEO itself. *Id.* at 166–167, 436 F.2d at 896–897.

Having rejected the defenses to jurisdiction of the defendant as inapplicable to the present proceeding, the Court now turns to the substantive consideration of the plaintiffs' claims.

*Termination of CAA Funding as Violative of the Economic Opportunity Act of 1964, as Amended*

As set forth earlier,[7] on January 29, 1973, President Nixon submitted his 1974 Budget Message to Congress. The budget message requests that no funds be appropriated OEO in fiscal year 1974. CAA functions are to be transferred to local agencies through the use of special revenue sharing. The existence of OEO as a federal agency is to cease. On the same date, the defendant issued a memorandum to all OEO regional offices, regarding the "termination of section 221 [CAA, 42 U.S.C. § 2808 (1970)] funding."[8] Before discussing this termination program in more detail, a brief outline of the CAA function of OEO will help place this controversy in the proper perspective.

A CAA is a state, a political subdivision of a state, a combination of political subdivisions, or a public or private non-profit agency formally designated as a CAA by a state or appropriate political subdivision. The CAA designation is official for purposes of receiving funds and administering programs upon ratification by the Director of OEO. 42 U.S. C. § 2790 (1970).

After official designation, a CAA is the local apparatus for citizen participation in the policy planning and implementation of the community action program (CAP) which

> includes . . . a sufficient number of projects or components to provide . . . a range of services and activities having a measurable and potentially major impact on causes of poverty in the community or those areas of the community where poverty is a particularly acute problem.

42 U.S.C. § 2790(a)(1) (1970).

In addition, a CAA must carry out the purposes of the Act in conformity with criteria prescribed by the OEO Director. Each CAA plans and administers its programs through a board composed of elected public officials, community leaders, and democratically selected representatives of the poor in the area served by the CAA.

Section 221 of the Act, 42 U.S.C. § 2808 (1970) grants local initiative funds to each CAA to plan and implement its own unique combination of antipoverty programs. Thus any individual CAA

---

7. See text accompanying note 4, *supra.*

8. The defendant issued the memorandum of January 29, 1973, even before he was appointed Acting Director of OEO. 9 Weekly Comp.Pres.Docs. 122 (on January 31, 1973). That memorandum has in essence been succeeded by Instruction 6730–3 of March 15, 1973, issued after Phillips was appointed. The Court for reasons set forth below, declares the January 29, 1973, and March 15, 1973, memoranda of instructions invalid and enjoins their implementation.

may decide to use its funds for locally determined priorities, such as health care or manpower training. CAAs typically administer their programs through a network of neighborhood centers that provide the opportunity for close contact with, and participation by the intended beneficiaries of the program. OEO grants to CAAs are on a yearly basis, with provisions for termination, suspension, or certain reductions in fundings to any individual CAA. 45 C.F.R. §§ 1067.1, 1067.2 (1972).

In addition, CAAs are eligible to apply for grants from OEO under section 222 of the Act, 42 U.S.C.A. § 2809, to fund specific antipoverty programs, such as legal services, comprehensive health services, and alcoholic counseling and recovery. Section 222 also enables CAAs to receive funds to administer programs under the Act funded by other federal agencies, such as Headstart preschool and elementary funds from the Department of Health, Education, and Welfare, and several work training and employment programs funded by the Department of Labor. Official designation as a CAA entitles it to receive funding from different federal departments for certain programs under the Act on a priority basis. If funds are available for the program in the area served by the CAA, the CAA receives the funds automatically in preference to other po-

tential recipients. Section 221 funds typically pay the overhead on facilities that are used to dispense those other services for which CAAs may obtain OEO and other federal funds.

In September 1972, the Congress passed the Economic Opportunity Amendments of 1972, Pub.L. No. 92–424, 86 Stat. 688, and that Act was signed into law by the President. Section 2(a) of the Amendments authorized and directed the continuance of the CAP program, as administered by CAAs, through the end of fiscal year 1975. 42 U.S.C.A. § 2837.[9] Section 3(c)(2) of the Amendments, note 5, *supra*, authorized and earmarked certain funding levels for section 221 programs through June 30, 1974. Finally, section 28 of the Amendments (42 U.S.C.A. § 2942 note) provides that

> Notwithstanding the provisions of section 602(d) of the Economic Opportunity Act of 1964, the Director of the Office of Economic Opportunity shall not delegate his functions under section 221 and title VII of such Act to any other agency.[10]

The January 29, 1973, memorandum of the defendant Phillips instructed all grantees of funds under section 221 that they must begin phasing out their programs because the fiscal year 1974 budget does not provide any funds for section 221 grants. Grantees which were scheduled for refunding between

---

9. 42 U.S.C.A. § 2837 provides:
 The Director [of OEO] shall carry out the programs provided for in this subchapter during the fiscal year ending June 30, 1967, and the eight succeeding fiscal years. For each such fiscal year only such sums may be appropriated as the Congress may authorize by law.
 CCAs and CAP are included within the subchapter reference of § 2837.

10. Section 602(d) of the Act, 42 U.S.C. § 2942(d) (1970) provides:
 In addition to the authority conferred upon him by other sections of this chapter, the Director is authorized, in carrying out his functions under this chapter, to—
 (d) with the approval of the President, arrange with and reimburse the heads of other Federal agencies for the

performance of any of his functions under this chapter and, as necessary or appropriate, delegate any of his powers under this chapter and authorize the redelegation thereof subject to provisions to assure the maximum possible liaison between the Office of Economic Opportunity and such other agencies at all operating levels, which shall include the furnishing of complete operational information by such other agencies to the Office of Economic Opportunity and the furnishing of such information by such Office to such other agencies;
Title VII, which along with section 221 is prohibited from transfer by section 28, establishes the Community Economic Development program (CED) to help establish local businesses in poverty areas.

that date and June 30, 1973, and which were otherwise qualified for refunding,[11] would receive phase-out grants only of up to six months' duration. Section 221 grantees with current funding scheduled to expire after July 1, 1973, would receive no further grants and would be required to use the current grant to phase out their operations. No funds at all would be available to any CAA after December 31, 1973.

OEO Instruction 6730–3, issued March 15, 1973, is more explicit in its terms regarding phase-out activities of CAAs. The instruction directs, at page 1, that

No costs chargeable to Section 221 grant funds shall be incurred except costs directly related to the orderly phase-out of the grantee's Section 221 activities, once the phase-out period commences (usually 45 to 90 days before the end of the grant period).

Instruction 6730–3 requires that each section 221 grantee prepare a phase-out plan and budget conforming to the requirements of the instruction and submit it 120 days prior to the date of termination of section 221 funding. The failure of a CAA to submit that plan in an acceptable form will lead to summary suspension and the stoppage of further checks from OEO. The phase-out plan is required to be in great detail, and a checklist is provided, with different aspects of the phase-out plan to be accomplished at set times before the section 221 grant expires. Extensions are unavailable even if funds remain unexpended at the end of the funding period.

The phase-out plan is to provide for the progressive release or reassignment of personnel. Accrued leave and termination pay, social security and withholding taxes are to be paid out of remaining funds. All personal property both of the CAA and the federal government is to be inventoried 150 days prior to the

termination of the grant period. Leases are to be paid and terminated. CAA records are to be indexed and forwarded to OEO. Fourteen pages of checklists and further specific instructions follow the eleven pages which detail the phase-out method described above. Under this state of facts, the Court is compelled to find that the defendant is terminating the CAA function of OEO and that CAAs are being required to use their funds to phase out their programs rather than carry out their purposes under section 221 of the Act.[12]

The plaintiffs claim that the defendant's program to terminate OEO's CAA function now is unlawful because the Congress last fall in section 2(a) of the 1972 Amendments, note 10, *supra*, provided that the Director of OEO "shall" carry out section 221 programs through June 30, 1975. The plaintiffs acknowledge that if Congress fails to provide funds for OEO to operate after June 30, 1973, either by continuing resolution or an appropriation, the defendant has no obligation to spend any money. But they argue that until funds to expire on June 30, 1973, the defendant is bound to operate OEO as before January 29, 1973, through the duty imposed upon the President under Article II, section 3, to "take Care that the Laws be faithfully executed." The plaintiffs construe the defendant's obligation under section 2(a) of the 1972 Amendments to continue to operate section 221 programs to be to carry out section 221 functions until either no funds are left or Congress terminates the program. This would entail the continued refunding of CAAs as before, contingent upon funds being appropriated for actual expenditure. In other words, CAAs would operate as before, including the reprocessing of grants, and cease operation only if funds actually do not become available.

11. See 45 C.F.R. §§ 1067.1, 1067.2 (1972).

12. During a colloquy with the Court at oral argument, counsel for the defendant admitted that the defendant is no longer providing any funding for section 221 programs and that he plans for the CAA function to "cease" completely in fiscal year 1974. Transcript at 136–38.

The defendant contends that because the budget message of the President, as the latest assessment of national needs and priorities, requests no funds for OEO to operate after June 30, 1973, the fiscally responsible course for the defendant to undertake is to phase out the CAA program that will be out of existence on July 1, 1973. In support of this theory, the defendant cites the general proposition of the law with which the plaintiffs are in total agreement— that the defendant cannot be forced to spend any funds which have not yet been appropriated. The defendant, however, goes on to argue that once the President has submitted his budget to the Congress, a program administrator must look to that message. If no funds are proposed for his agency, it is his duty to terminate that agency's functions to effect the least "waste" of funds. Because the Court can find no support for this position in the budget act, the OEO act, the history of OEO appropriations, or the Constitution itself, the Court finds for the plaintiffs on this count.

The Budget and Accounting Act of 1921, 42 Stat. 20, was the original legislation which required that the President submit a proposed budget at the beginning of each session of Congress. The pertinent section of that Act, as amended, requires that

(a) The President shall transmit to Congress during the first fifteen days of each regular session, the Budget, which shall set forth his Budget mes-sage, summary data and text, and supporting detail. The Budget shall set forth in such form and detail as the President may determine—

. . . . . .

(5) estimated expenditures and *proposed appropriations* necessary in his judgment for the support of the Government for the ensuing fiscal year.

31 U.S.C. § 11(a)(5) (1970) (emphasis added).

There is no question both from the text of the Act and the legislative history [13] that the budget is nothing more than a proposal to the Congress for the Congress to act upon as it may please. No citation of authority is required to show that the Congress not infrequently acts contrary to its requests.

The defendant nevertheless argues that until an appropriations bill for OEO is passed, substantive obligations regarding fiscal responsibility imposed on him by 42 U.S.C. §§ 2835(a) and (d) (1970) require that he terminate the CAA functions now before funds are exhausted. The remaining section 221 funds, he argues, could be spent in a more fiscally responsible manner in winding up the affairs of the soon to be defunct CAAs than in keeping section 221 programs functioning. Neither section cited lends any support to that thesis. Section 2835(a) concerns the responsibility of the OEO Director to insure the fiscal integrity of CAAs through the establishment of proper ac-

---

13. The House Report on the budget act was unequivocal:

It will doubtless be claimed by some that this is an Executive budget and that the duty of making appropriations is a legislative rather than Executive prerogative. The plan outlined does provide for an Executive initiation of the budget, but the President's responsibility ends when he has prepared the budget and transmitted it to Congress. To that extent and to that extent alone does the plan provide for an Executive budget, but the proposed law does not change in the slightest degree the duty of Congress to make the minutest examina-tion of the budget and to adopt the budget only to the extent that it is found to be economical. If the estimates contained in the President's budget are too large, it will be the duty of Congress to reduce them. If in the opinion of Congress the estimates of expenditure are not sufficient, it will be within the power of Congress to increase them. *The bill does not in the slightest degree give the Executive any greater power than he now has over the consideration of appropriations by Congress.* H.R. Rep.No.362, 66th Cong., 1st Sess. 7 (1919) (emphasis added).

counting procedures. Section 2835(d) on its face requires the Director to take action

> to promote the continuity and coordination of all . . . [section 221] programs . . . including provision for the periodic programming and supplementation of assistance previously provided.

Termination of the CAA function because no appropriation bill had yet been passed and no funds were requested in the budget would not be in keeping with the obligations to maintain fiscal responsibility as those obligations are defined by the Act itself. Those obligations are clearly intended to insure the fiscal responsibility of an ongoing program.

Moreover, if the defendant were correct in his argument, it would have been the responsibility of every OEO Director to terminate the section 221 program before the end of the fiscal year. Since its inception in 1964, Congress has never funded OEO prior to the end of the fiscal year. The average date of the appropriation bill has been the following November, and the OEO appropriation bill for fiscal year 1970 was not passed until March 5, 1970, less than four months prior to its termination.[14] Assuming, as the defendant argues, that a fiscally responsible administrator must terminate programs under his supervision in the absence, as here, of either an appropriation or a budget request for funds, any program from OEO to agricultural crop subsidies, could be terminated by the Executive by not requesting any funds in the budget to continue its operation. That construction would in effect give the President a veto power through the use of his budget message, a veto power not granted him by Article I, section 7, of the Constitution.

In defense of this position, the defendant argues that once the President makes known his disapproval of a program through his budget message, the Congress can act to preserve that authorized program by passing an appropriation bill which would force the President to continue the program. This argument, even if it were valid in a situation in which the authorization bill for a program expired at the end of the program's appropriation, an argument of doubtful validity, cannot legitimize the defendant's actions here in the face of the multiple year authorization of sections 2(a) and 3(c)(2) of the 1972 Amendments, notes 5 and 9, *supra*.[15]

---

14. 1966: Pub.L. No. 89–309, 79 Stat. 1133 (Oct. 31, 1965) ; 1967: Pub.L. No. 89–697, 80 Stat. 1057 (Oct. 27, 1966) ; 1968: Pub.L. No. 90–239, 81 Stat. 773 (Jan. 2, 1968) ; 1969: Pub.L. No. 90–557, 82 Stat. 969 (Oct. 11, 1968) ; 1970: Pub.L. No. 91–204, 84 Stat. 23 (Mar. 5, 1970) ; 1971: Pub.L. No. 91–667, 84 Stat. 2001 (Jan. 11, 1971) ; 1972: Pub.L. No. 92–184, 85 Stat. 627 (Dec. 15, 1971) ; 1973: Pub. L. No. 92–607, 86 Stat. 1498 (Oct. 31, 1972).
Congress has never acted later than July 1 in passing the continuing resolution for funds for OEO:
1966: Pub.L. No. 89–58, 79 Stat. 204 (June 30, 1965) ; 1967: Pub.L. No. 89–481, 80 Stat. 233 (June 30, 1966) ; 1968: Pub.L. No. 90–38, 81 Stat. 97 (June 30, 1967) ; 1969: Pub.L. No. 90–366, 82 Stat. 275 (June 29, 1968) ; 1970: Pub.L. No. 91–33, 83 Stat. 38 (June 30, 1969) ; 1971: Pub.L. No. 91–294, 84 Stat. 333 (June 29, 1970) ; 1972: Pub.L. No. 92–38, 85 Stat. 89 (July 1, 1971) ; 1973: Pub.L. No. 92–334, 86 Stat. 402 (July 1, 1972).

15. There are two basic types of legislation. Authorization bills merely provide the programs for which Congress must still appropriate funds in an appropriations bill before the program can operate:
> Legislative proposals when enacted and become law are referred to generally as "legislative authority."
> Funds for carrying on the work of the Government pursuant to "legislative authority" are provided in general and special appropriation bills, which usually originate in the House.
Enactment of A Law, S.Doc.No.35, 90th Cong., 1st Sess. 5 (1967).
Moreover, under established Congressional procedures, substantive law provisions must be placed in authorization bills; they would be ruled out of order in an appropriation bill. House of Representatives Rules ¶ 21, § 2; Jefferson's Manual & Rules of The House of Representatives

Congress, by its use of a multiple year authorization, has indicated its intent that the CAA function of OEO continue for at least that period of time. Moreover, in passing the 1972 Amendments which contained that multiple year authorization, the Congress found that the CAA program in particular should continue. The House Committee on Education and Labor, in reporting out the bill which was enacted as the 1972 Amendments was

> convinced that the community action concept has matured and met the test of practice and time.

> . . . . . .

> [The Committee] intend[s] that . . . there be no diminution in program levels for local initiative.

> H.R.Rep. No. 92–815, 92d Cong., 2d Sess. 14, 15 (1972), U.S.Code Cong. & Admin.News. p. 3237.

The Senate Committee on Labor and Public Welfare was equally impressed with the CAA program:

> The committee was especially impressed in the hearings at the demonstration of maturity, sophistication, and competence by community action agencies and their spokesmen.

> The 930 community action agencies around the country . . . are the very heart of the War on Poverty.

> S.Rep. No. 92–792, 92d Cong., 2d Sess. 9–10 (1972).

In addition, both reports detail the praise civic groups have had for CAAs, and recite many of their accomplishments. The clear Congressional intent of the multiple year authorization was that the program continue, especially in the light of the late appropriations process that has been detailed earlier. The multiple year authorization enables the Congress to evidence its intent to continue to fund a program (with the option to terminate it if it so pleases)

without being forced to make that intent known by appropriating funds before the end of the fiscal year.

In effect the defendant argues that by use of the budget message the Executive can force the Congress to legislate to keep an authorized program from terminating. The defendant contends further that he can use the funds appropriated by Congress to run section 221 programs to terminate them and force the Congress to act before the time that it has set for itself (June 30, 1973) to act on appropriating the funds as allowed by the authorization. Thus the Executive would effectively legislate the termination of section 221 programs before Congress has declared that they shall end. Article I, section 1, of the Constitution vests "[a]ll legislative powers" in the Congress. No budget message of the President can alter that power and force the Congress to act to preserve legislative programs from extinction prior to the time Congress has declared that they shall terminate, either by its action or inaction.

The defendant concedes at pages 22–23, note 5, of his original memorandum that the OEO Director is under an obligation to carry on programs in any year in which funds are appropriated. That is all the plaintiffs seek here—that the defendant carry on section 221 programs through fiscal 1973, and not terminate them, as this Court has found that the defendant is doing.

An authorization does not necessarily mean that a program will continue. Congress, of course, may itself decide to terminate a program before its authorization has expired, either indirectly by failing to supply funds through a continuing resolution or appropriation, or by explicitly forbidding the further use of funds for the programs, as it did in the case of the supersonic transport.[16] But Congress has not

464–65, 470–71 (1971). Thus Congress can indicate its intent that a program shall continue only through authorization bills.

16. Pub.L. No. 92–7, 85 Stat. 12, provided for the termination of SST funding by not continuing it in the joint funding resolution. Section 2 of that law further

chosen either of these courses, although it may in the future. Until that time, historical precedent, logic, and the text of the Constitution itself obligate the defendant to continue to operate the section 221 programs as was intended by the Congress, and not terminate them.[17]

█ The conclusion that the Executive must continue to operate an authorized program until the funds expire or Congress declares otherwise is supported, although not conclusively, by the sparse case law which relates even tangentially to the problem. As has been suggested by commentators on the related question of presidential impoundment of appropriated funds, not even remotely relevant cases are directly in point.[18] But the case law must be discussed for completeness, and for the light it does shed on the issues.

The starting point of any case analysis must be Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), the *Steel Seizure Case,* the leading case on the constitutional division of power between the President and the Congress. In 1952 President Truman ordered the Secretary of Commerce to seize the nation's steel mills and operate them on behalf of the United States to prevent what he believed would be a disastrous strike during the Korean War. The mills cooperated, although under protest, and challenged the action in the federal courts.

By a 6–3 vote, the Supreme Court affirmed the decision of the District Court holding the seizure unlawful. 103 F. Supp. 569 (D.D.C.1952). Mr. Justice Black wrote for the majority that authorization for the President's actions "must stem either from an act of Congress or from the Constitution itself." 343 U.S. at 585, 72 S.Ct. at 866. Finding no such authorization, the seizure was invalid. As the defendant contends in the instant case, the President attempted to justify his actions on the provisions of Article II that "the executive power shall be vested in a President," and that "he shall take Care that the Laws be faithfully executed." The Court held:

Nor can the seizure order be sustained because of the several constitutional provisions that grant executive power to the President. In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. . . .

. . . . . .

. . . The Constitution does not subject this lawmaking power of

---

specifically forbade the use of funds under the resolution for the SST. See also the text following note 20 *infra* for further details of that funding termination.

17. 31 U.S.C. § 628 (1970) may have some relevancy to the issue, although none of the parties have seen fit to cite it:

Except as otherwise provided by law, sums appropriated for the various branches of expenditure in the public service *shall be applied solely to the objects for which they are respectively made, and for no others.* (Emphasis added.)

Congress, in its last appropriation for OEO, Pub.L. No. 92–607, ch. 4, 86 Stat. 1503, provided the funds:

For expenses necessary *to carry out* the provisions of the Economic Opportunity Act of 1964 . . . as amended . . . . (Emphasis added.)

When coupled with the defendant's admitted use of the appropriated funds to terminate section 221 programs, 31 U.S.C. § 628 would appear to forbid the use of funds for termination purposes.

18. Fisher, Funds Impounded by the President: The Constitutional Issue, 38 Geo. Wash.L.Rev. 124 (1969); Miller, Presidential Power to Impound Appropriated Funds: An Exercise in Constitutional Decision-Making, 43 N.C.L.Rev. 502, 525, 533 (1965).

Congress to presidential . . . supervision or control.

. . . . . .

The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times. *Id.* at 587–589, 72 S.Ct. at 867.

■ In the instant case the defendant claims that the President's assessment of the needs of the nation through his budget message requires him, as Acting Director of OEO, to exercise his responsibility to the fiscal integrity of OEO and terminate section 221 programs despite the Congressional mandate to continue them. Although the language of the Court quoted from the *Steel Seizure Case* is strong precedent for this Court's earlier conclusion that the budget message cannot have the effect of law, the opinion is not conclusive on the precise justification of fiscal responsibility the defendant has urged here. The defendant's action may be "within the gloss on 'executive power'" from long precedent found in Mr. Justice Frankfurter's concurrence, *id.* at 610–611, 72 S.Ct. at 897.

But the executive power claimed by the defendant is more than a mere gloss. As the Court has found earlier, if the power sought here were found valid, no barrier would remain to the executive ignoring any and all Congressional authorizations if he deemed them, no matter how conscientiously, to be contrary to the needs of the nation. Historical precedent provides evidence that multiple year authorizations indicate Congressional intent that a program continue. The Constitution cannot support such a gloss and still remain a viable instrument.

The defendant really argues that the Constitution confers the discretionary power upon the President to refuse to execute laws passed by Congress with which he disagrees. In Kendall v. United States, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), the Supreme Court held that the Postmaster General could not refuse to pay a contractor for services rendered once Congress has specifically directed payment. Once again, the duty of the President to faithfully execute the laws was cited in behalf of the refusal. The Court held that that "principle, which if carried out in its results, to all cases falling within it, would be clothing the president with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Id.* at 613. In subsequent cases the Court continued to hold that the executive could not ignore a legislative directive to make payment to a particular person. United States v. Louisville, 169 U.S. 249, 18 S.Ct. 358, 42 L. Ed. 735 (1898); United States v. Price, 116 U.S. 43, 6 S.Ct. 235, 29 L.Ed. 541 (1885). *See also* Spaulding v. Douglas Aircraft Co., 60 F.Supp. 985, 988 (S.D. Cal.1945), aff'd, 154 F.2d 419 (9th Cir. 1946).

■ In the present case, the Congress has not directed that funds be granted to any particular CAA. The OEO Director has been granted discretion in the disbursing of funds so as to effectuate the goals of the program. 42 U.S.C. § 2808 (1970). But discretion in the implementation of a program is not the freedom to ignore the standards for its implementation. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 411, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Likewise when discretion in spending appropriated funds is removed by law, an administrator must comply and spend those funds. State Highway Commission of Missouri v. Volpe, 347 F.Supp. 950 (W.D.Mo.1972), aff'd, 479 F.2d 1099 (8th Cir. 1973).[19] An adminis-

---

19. *See also* Decision B–156510 of the Comptroller General (Feb. 23, 1971), reprinted in Hearings on Executive Impoundment of Appropriated Funds Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 92d Cong., 1st Sess. 562 (1971). In that decision the Comptroller General expressed his view that the broad administrative discretion granted the Surgeon General under 42 U.S.C. § 248(a) (1970) to administer public health service hospitals and clinics

trator's responsibility to carry out the Congressional objectives of a program does not give him the power to discontinue that program, especially in the face of a Congressional mandate that it shall go on.

In State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir. 1973), the Eighth Circuit recently held that the Secretary of Transportation could not impose contract controls on (impound) funds for state highway programs for reasons outside those standards which the Congress had established for the approval or disapproval of the programs. Writing for the majority, Circuit Judge Lay held:

> To reason that there is implicit authority within the Act to defer approval for reasons totally collateral and remote to the Act itself requires a strained construction which we refuse to make. It is impossible to find from these specific grants of authority discretion in the Secretary to withhold approval on projects Congress has specifically directed because of a system of priorities the Executive chooses to impose on all expenditures. The Congressional intent is that the Secretary may exercise his discretion to insure that the roads are well constructed and safely built at the lowest possible cost, all in furtherance of the Act, but when the impoundment of funds impedes the orderly progress of the federal highway program, this

hardly can be said to be favorable to such a program. In fact, it is in derogation of it. It is difficult to perceive that Congress intended such a result. Id. at 1114.

In the instant case the Director of OEO has discretion in funding individual CAAs under section 221 itself, subject to conditions imposed by lawful regulations. The Director further must establish controls to insure the financial responsibility of CAAs. 42 U.S.C. § 2835 (1970). But these provisions to insure the functional and fiscal integrity of an ongoing section 221 program do not give the Director the discretion to halt that section 221 program for reasons unrelated to the purposes of the Economic Opportunity Act. That construction of the Act, in the face of the Congressional mandate of 42 U.S.C.A. § 2837 that section 221 programs shall continue, is no less strained than the construction which the Court rejected in *State Highway Commission*.

As one commentator has framed the issue in the impoundment context:

> The expenditure process is one in which administrators must enjoy substantial discretion in exercising judgment and in taking responsibility for those actions, but those actions ought to be directed toward executing Congressional, not administrative, policy. It is up to Congress to make that policy clear and consistent.[20]

---

would be extended unwarrantedly by a decison to close all public health service general hospitals. McKay v. Central Electric Power Coop., 96 U.S.App.D.C. 158, 223 F.2d 623 (1955), and Commonwealth of Massachusetts v. Connor, 248 F.Supp. 656 (D.Mass.), aff'd per curiam, 366 F.2d 778 (1st Cir. 1966), cited by the defendant, are inapposite. In *McKay* the Court held only that Congress had not expressly commanded the funds in question to be spent in the fashion the plaintiffs sought. Likewise in *Connor* the Court held that any right of recovery of funds lay in the Court of Claims for breach of contract, and not in the District Court through mandamus. The plaintiffs in the instant suit do not seek an order compelling the defendant to spend any particular funds, but only that he follow the explicit man-

date of Congress to continue the section 221 program.

20. Fisher, Presidential Spending Discretion and Congressional Controls, 37 Law & Contemp.Prob. —— (Winter 1972 issue, to be published), reprinted in Joint Hearings on S. 373 Before the Ad Hoc Subcomm. on Impoundment of Funds of the Senate Comm. on Gov't Operations and the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 93d Cong., 1st Sess. 683, 719 (1973). *See also* Miller, *supra* note 18, at 536; Memorandum from Asst. Attorney General William H. Rehnquist to Hon. Edward L. Morgan, Deputy Counsel to the President, reprinted in *Hearings, supra* note 19, at 279–84.

■ Congress has told the Director of OEO through its authorization that it intends that section 221 programs continue. Until Congress changes that command, the defendant is bound to honor it.

■ Counsel for the defendant urged at oral argument that unless the defendant ignored that Congressional command and terminated section 221 programs, financial chaos would result on July 1, 1973, if the Congress failed to include OEO in a continuing resolution or pass an appropriation bill. This Court will not presume that Congress will act in such an irresponsible manner, any more than it assumes that the defendant is acting in bad faith in his assertion of the duty to terminate section 221 funding. But Congress has shown how the problem posed by counsel for the defendant would be solved in its past action terminating funding for the SST program, *supra* at note 16. Funds were appropriated "[f]or expenses, not otherwise provided for, necessary for the termination of development of the civil supersonic aircraft and to refund the contractors' cost shares, $97,300,000, to remain available until expended." Pub.L. No. 92-18, 85 Stat. 40. Thus when Congress orders that a program go forth and later changes its mind, it is for the Congress in the responsible exercise of its legislative power to make provisions for termination. Until those provisions are made, the function of the Executive is to administer the program in accord with the legislated purposes.

### Termination of CAA Funding as Violative of the Reorganization Act

Another theory argued by the plaintiffs in support of their complaints is that the actions of the defendant Phillips in terminating section 221 funding are violative of the Reorganization Act, 5 U.S.C. §§ 901-913 (1970). The Court finds for the plaintiffs on this count, for reasons set forth below. This finding is independent of that regarding the defendant's duty not to terminate section 221 funding under his responsibility to administer the program, and constitutes a separate ground for this Court's decision.

As has been discussed in detail, *supra,* the defendant has announced plans to terminate section 221 funding and the OEO as a separate federal agency. Steps have already been taken to implement that plan, and as the extensive affidavits filed by the plaintiffs in *West Central* demonstrate, that termination effect is already being felt by CAAs. The Court repeats its earlier finding that the defendant is terminating or abolishing the section 221 function of OEO.

■ The Reorganization Act of 1949, as amended, 5 U.S.C. §§ 901-913 (1970) is a broad delegation of authority by Congress to the President to initiate and propose changes in the organization and functions of the Executive branch. The Act is in part a Congressional recognition that an essential element of any legislative program is the organization and characteristics of the executive agencies that administer that program. 5 U.S.C. § 901(b).

The purposes of a reorganization as set forth in section 901(a) of the Act are generally to promote the more efficient management of executive branch functions, *economy,* or the elimination of duplication of effort. Sections 903(a)(2) and (6) go on to provide that

(a) When the President, after investigation, finds that—

. . . . . .

(2) the abolition of all or a part of the functions of an agency; [or]

. . . . . .

(6) the abolition of the whole or a part of an agency which agency or part does not have, or on the taking effect of the reorganization plan will not have, any functions; is necessary to accomplish one or more of the purposes of section 901(a) . . . ., he shall prepare a reorganization plan for the making of the reorganizations as to which he has made findings and which he includes

in the plan, and transmit the plan . . . to Congress. . . .

The reorganization plan takes effect without further action unless either House of Congress passes a resolution within 60 days of transmittal stating in substance that that House does not favor the reorganization plan. 5 U.S.C. § 906(a). The Act further outlines the procedures to be followed if either House passes such a resolution.

This Court has found that the defendant's directives require the use of section 221 funds for phase-out purposes and forbid their use for any other purposes, including the implementation of section 221 programs. Thus the section 221 function has already been abolished. The defendant has stated unequivocally that the CAA function and OEO itself will cease on or before June 30, 1973, and that his plans are to reach that goal by April 28, 1973. Moreover the defendant has evidenced clear reliance on the budget message of the President as justification for that plan. The budget message, note 4 *supra,* states that the President proposes that the CAA function and OEO shall cease to exist. As found earlier, the Court must conclude that the program of the defendant is terminating or abolishing the CAA function and OEO itself. Section 903(a) of the Reorganization Act requires that a reorganization plan be submitted to the Congress before the abolition of that function or the agency itself can take place. Thus in the absence of any contrary legislation, the defendant's plans to terminate the CAA function and the OEO itself are unlawful as beyond his statutory authority.

The defendant argues that section 602(d) of the Economic Opportunity Act, 42 U.S.C. § 2942(d) (1970) quoted in note 10 *supra,* provides the defendant with the statutory authority to transfer many OEO functions to other agencies. Although this is correct the defendant himself concedes that Section 602(d) provides no basis for the transfer not only of section 221 and CED functions by reason of section 28 of the 1972 Amendments to the Act,[21] but also of the legal services program, 42 U.S.C. § 2809(a)(3) (1970), because of a 1969 amendment to the Act.[22] Defendant's Opposition to Plaintiffs' Cross-Motions for Summary Judgment at 13. Moreover, the legislative history of the 1972 Amendments demonstrates the Congressional intent that neither section 221 nor CED functions can be transferred without using the Reorganization Act procedures.[23]

The defendant nevertheless argues that he has not proposed that section 221 funding be delegated to any other agency but rather that it be terminated and that the prohibition of section 28 does not apply. Even if that argument were valid section 602(d) would still provide no basis for bypassing the Reorganization Act because it allows only the

21. Pub.L. No. 92–424, § 28, 86 Stat. 688, 42 U.S.C.A. § 2942 note, quoted in the text at note 10 *supra.*

22. Pub.L. No. 91–177, tit. I, § 114, 83 Stat. 827, 42 U.S.C. § 2809 note (1970) provides:

> The authority of section 602(d) of the Economic Opportunity Act of 1964 shall not apply to the Legal Services program authorized under section 222(a)(3) of such Act. The Director of the Office of Economic Opportunity shall not delegate the program authorized under such section 222(a)(3) to any other existing Federal agency.

As was noted in the text *supra,* many if not most legal services programs are funded through CAAs.

23. Senator Nelson, principal Senate sponsor of the bill, stated on the floor that

> the provision only prohibits the Director of OEO from delegating to other agencies two programs—local initiative community action programs under section 221 of the Economic Opportunity Act and the community economic development program under title VII of the act.

. . . . . .

> [E]ven with respect to local initiative and community economic development, the President may transfer such programs by Executive reorganization plans.

118 Cong.Rec. S 14077 (daily ed., Sept. 5, 1972).

delegation of a function, not its abolition. Moreover, to read section 28 as allowing the termination of section 221 funding although forbidding its delegation to another agency would be unreasonable in the light of the clearly expressed Congressional intent that section 221 funding be carried on, *supra*.

The defendant plans to abolish OEO as an agency because it will no longer have any functions to carry out. Assuming for the moment that the defendant were to accomplish this by delegating all OEO functions but legal services and CED under section 602(d), as he plans, and to transfer those to other agencies through substantive legislation, as he plans,[24] the defendant would still be in violation of the Economic Opportunity Act. Section 602(d), note 10 *supra*, requires that programs may be delegated "subject to provisions to assure the maximum possible liaison" between OEO and the other agency. No such liaison could be maintained if OEO were no longer in existence.[25] Moreover, Congress itself in the original Act recognized that section 602(d) could not be used to transfer the entire OEO by providing for a total transfer in section 601, 42 U.S.C. § 2941(b) (1970):

(b) Notwithstanding the provisions of section 5(b) of the Reorganization Act of 1949 [now 5 U.S.C.A. § 905(b), under which the President's power to initiate a reorganization plan expired April 1, 1973], at any time after one year from August 20, 1964 the President may, by complying with the procedures established by that Act, provide for the transfer of the Office from the Executive Office of the President and for its establishment elsewhere in the executive branch as he deems appropriate.

■ Therefore the Court finds that the termination of section 221 funding by the defendant is violative of the provisions of the Reorganization Act and beyond his statutory power and will be enjoined as unlawful.[26]

### Publication of Directives in the Federal Register

The plaintiffs rely on an additional theory for declaring the actions of the defendant in terminating section 221 funding to be unlawful. Section 22 of the 1972 Amendments to the Economic Opportunity Act, 42 U.S.C.A. § 2971b provides:

All rules, regulations, guidelines, instructions, and application forms published or promulgated pursuant to this chapter [the OEO Act] shall be published in the Federal Register at least thirty days prior to their effective date.

It is conceded by the defendant that the January 29, 1973, and March 15, 1973, directives on the termination of section 221 funding, *supra*, have never been published in the Federal Register, although the defendant claims that the latter has been prepared for publication. The Court holds that until section 2971b has been complied with, the directives of the defendant are illegal as issued beyond the defendant's statutory authority.

---

24. March 9, 1973 Affidavit of Howard J. Phillips, filed in support of the defendant's motion for summary judgment, paragraphs 3 f and g.

25. At oral argument counsel for the defendant advised the Court that the Office of Management and Budget was considering a plan to continue a small component of OEO to provide these liaison functions. Transcript at 36–37. At the present both the budget message of the President, *supra* note 4, and the directives of the defendant Phillips indicate that they plan for OEO to cease to exist as of July 1, 1973, except as the General Services Administration may wind up OEO's affairs.

26. The Court expresses no view on whether OEO as an entity could be abolished by means of a reorganization plan. There is some indication in the legislative history of the Reorganization Act that the Act could not be used to abolish an executive agency and not place its functions in another agency. *See* 95 Cong.Rec. 891, 914 (1949) (Remarks of Reps. Lanham, Vorys and Dawson).

The defendant argues that section 2971b does not mean that OEO regulations must be published for 30 days before they may take effect if all those affected by those regulations have notice of those regulations or if the regulations were issued in emergency situations· or if the documents have been prepared for publication but are unpublished. The statute, however, does not provide for any of those contingencies. It says that all regulations "shall" be published 30 days prior to their effective date. No clearer expression could have been used by the Congress to indicate that OEO regulations would not be effective until 30 days after their publication.

The defendant has published several regulations in the Federal Register. The first, OEO Regulation 1067, published at 38 Fed.Reg. 6894 (March 14, 1973), deals with control of cash by grantees and grant processing and funding procedures essentially in accord with the January 29, 1973 memorandum, *supra.* The different subparts of this regulation purport to be effective February 8, February 9, and March 1, 1973. But, assuming that those regulations were issued to accomplish a legally authorized purpose, section 2971b prescribes that they would become effective 30 days after publication and not upon the date the Acting Director chooses in the regulation. Thus these regulations, if they were otherwise valid, are ineffective until 30 days have elapsed from the date of their publication.[27] The second published regulation, OEO Regulation 1069.3–5, 38 Fed.Reg. 7117 (March 16, 1973) restricts travel by CAA employees with OEO grant funds without permission from the Acting Director. That regulation purports to be effective March 16, 1973, the date of its publication. Enforcement of that regulation before 30 days have elapsed would clearly be contrary to the command of section 2971b

and thus beyond the defendant's authority and unlawful.

■ Thus, even assuming that their subject matter is a proper implementation of the section 221 program, the Court holds that the OEO instructions issued January 29, 1973, and March 15, 1973, are void and of no consequence until the required 30 days have elapsed from the date of publication. *See* Piercy v. Tarr, 343 F.Supp. 1120, 1127–1128 (N.D.Cal.1972); Gardiner v. Tarr, 341 F.Supp. 422, 435 (D.D.C.1972).

As stated in note 1 *supra,* the plaintiffs in *National Council* have also named Roy L. Ash, Director of OMB, as a defendant. The original complaint alleged that Ash was impounding funds appropriated by Congress for OEO, contrary to his legal obligations. Because no showing has been made by the plaintiff on this issue, defendant Ash's motion to dismiss will be granted.

An appropriate Order will be entered with this Opinion granting the plaintiffs' cross-motions for summary judgment and· related relief. Defendant Ash's motion to dismiss is granted. Defendant Phillips' motion to dismiss or for summary judgment is denied.

### ORDER

These consolidated cases having come before the Court on the defendants' motion to dismiss or in the alternative for summary judgment, and the plaintiffs' cross-motions for summary judgment, as to which there is no genuine issue of material fact, and the Court having considered the points and authorities in support of and in opposition to those motions, and having heard argument of counsel, and for the reasons stated in the Opinion filed in this case,

It is this 11th day of April, 1973,

Ordered

---

27. Of course, as the Court has held earlier, these regulations are unlawful and may not be implemented in any event to the extent that they terminate section 221 funding.

That the plaintiffs' motion for voluntary dismissal in Civil Action No. 379–73 be and is hereby denied;

That defendant Phillips' motion to dismiss be and is hereby denied;

That defendant Ash's motion to dismiss or for summary judgment be and is hereby granted;

That defendant Phillips' motion for summary judgment be and is hereby denied;

That the plaintiffs' motions for summary judgment be and are hereby granted;

Further ordered, adjudged, and declared that the acts or omissions or both, including all rules, regulations, guidelines, instructions, and other communications, written or oral, heretofore published, promulgated or otherwise communicated, directing, providing for, or intended to accomplish the termination, dissolution, or abolition of the Office of Economic Opportunity, or of the termination of funding or functioning of Community Action Agencies, designated in accordance with the provisions of sections 210 and 221 of the Economic Opportunity Act of 1964, as amended, 42 U.S.C. §§ 2790 and 2808 (except those Community Action Agencies found not to be qualified for refunding pursuant to regulations as set forth in 45 C.F.R. §§ 1067.1, 1067.2 (1972)), are unauthorized by law, illegal, and in excess of statutory authority whether such acts or omissions were those of defendant Phillips, or any agent, servant, employee, or other person acting in concert with defendant Phillips, or otherwise employed by or purportedly acting for or on behalf of him or of the Office of Economic Opportunity;

Further ordered, adjudged, and declared that all rules, regulations, guidelines, instructions, and other communications, written or oral, heretofore published, promulgated or otherwise communicated, directing, providing for, or intended to accomplish the termination, dissolution or abolition of the Office of Economic Opportunity, or of the termination of funding or functioning of Community Action Agencies, designated in accordance with the provisions of sections 210 and 221 of the Economic Opportunity Act of 1964, as amended, 42 U.S.C. §§ 2790 and 2808 (except those Community Action Agencies found not to be qualified for refunding pursuant to regulations set forth in 45 C.F.R. §§ 1067.1, 1067.2 (1972)), are unauthorized by law, illegal, in excess of statutory authority, null and void, whether such rules, regulations, guidelines, instructions, or other communications were those of defendant Phillips, or any agent, servant, employee, or other person acting in concert with defendant Phillips, or otherwise employed by or purportedly acting for or on behalf of the Office of Economic Opportunity;

Further ordered that defendant Phillips and any agent, servant, employee, or other person acting in concert with defendant Phillips, or otherwise employed by or purportedly acting for or on behalf of him or the Office of Economic Opportunity, be and the same are hereby enjoined from implementing or enforcing, or both, any such rule, regulation, guideline, instruction, or other communication, written or oral, heretofore published, promulgated, or otherwise communicated;

Further ordered that, within ten days of the date of this Order and Judgment, defendant Phillips send copies of this Order and Judgment to all Office of Economic Opportunity Regional Directors and to all Community Action Agencies which on January 29, 1973, were designated such agencies.