Augusto GUADAMUZ et al., Plaintiffs,

v.

Roy L. ASH et al., Defendants.

Civ. A. No. 155–73.

United States District Court,
District of Columbia.

Dec. 28, 1973.

Ralph Santiago Abascal, San Francisco Neighborhood Legal Assistance Foundation, San Francisco, John R. Kramer, Washington, D. C., for plaintiffs.

Irving Jaffe, Harland F. Leathers, J. Michael Cogbill, U. S. Dept. of Justice, Civil Div., Washington, D. C., Harold H. Titus, Jr., Arnold T. Aikens, Washington, D. C., for defendants.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This is an action for declaratory and injunctive relief brought by plaintiffs who challenge the authority of the defendants to withhold funds appropriated by Congress from two congressionally approved programs, the Rural Environmental Assistance Program (REAP)[1] and the Federally Assisted Code Enforcement Program (FACE).[2] Upon motion of the plaintiffs, this court granted a preliminary injunction on June 29, 1973, which required the defendants to ensure that impounded funds appropriated for the FACE program would not revert to the general fund of the Treasury. No injunction issued as to the funds appropriated for REAP since such funds remained available beyond the close of fiscal 1973. The case then came before the court on cross-motions for summary judgment and in accordance with Local Rule 1–9(g), the parties submitted statements of material facts as to which there was

---

1. REAP is conducted pursuant to the authority contained in sections 7 through 17 of the Soil Conservation and Domestic Allotment Act of 1936, as amended. 16 U.S.C. §§ 590g–590o, 590p(a), 590q (1970).

2. FACE is conducted pursuant to the authority contained in sections 115, 117 and 312 of the Housing Act of 1949, as amended. 42 U.S.C. §§ 1452b, 1466, 1468 (1970).

no genuine dispute. While the court had the matter under advisement, defendants moved to dismiss as moot those portions of plaintiffs' amended complaint which challenged the impoundment of FACE funds. Affidavits accompanying the motion to dismiss indicated that defendants Ash and Lynn would voluntarily release for obligation all FACE funds that previously had been impounded. In opposing the motion, plaintiffs contended that approximately one-third of all FACE funds remained impounded by defendants. Despite the apparent existence of a factual controversy, the court finds that there are no material facts in dispute and that the case is ripe for summary judgment.

### THE PARTIES

Plaintiffs in this action can be divided into two groups of individuals who sue as representatives of two distinct classes adversely affected by defendants' actions. Plaintiff W. M. Scarbrough is a cattle rancher who has been a recipient of cost-sharing benefits under REAP and its predecessor program since 1944. He challenges the termination of REAP and sues on behalf of himself and all other farmers throughout the nation who would have received REAP grants but for the impound placed on REAP funds by defendants Ash and Butz. Plaintiffs Apana, Espinoza and Guadamuz are low-income property owners in San Francisco who have applied for FACE grants and loans and they bring this action on behalf of themselves and all those similarly situated who would have received FACE benefits but for the impound placed upon funds appropriated for section 312 rehabilitation loans [3] by defendants Ash and Lynn. In addition, there are seven organizational plaintiffs which bring this action on their own behalf.

The court is of the opinion that these matters are appropriate for class action treatment. The prerequisites of Rule 23(a), Federal Rules of Civil Procedure, are clearly satisfied. The two classes are so numerous that joinder of all members would be impracticable; there are questions of law common to each class; the claims of the plaintiffs are typical of the classes they represent; and the representative plaintiffs will fairly and adequately protect the interests of their class. The two classes are certifiable under either Rule 23(b)(1) or 23(b)(2), Federal Rules of Civil Procedure, since the prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications which would impose incompatible standards of conduct upon the defendants or would effectively be dispositive of the interests of other members of their class. In addition, the defendants have acted on grounds that are generally applicable to each class, thereby making final injunctive or declaratory relief appropriate with respect to each class.

The remaining plaintiffs are organizations which sue in their own right. Plaintiff San Francisco Tomorrow, Inc. is a non-profit corporation formed for the purpose of encouraging the preservation and improvement of the urban environment of the San Francisco Bay area. The majority of its members work or reside in the City and County of San Francisco. Plaintiffs Alamo Square Association, Alamo Square Citizen's Advisory Committee, Bernal Heights Association, Bernal Heights Citizen's Advisory Council, Duboce Triangle Property Owners Association, and Noe-Henry Association are unincorporated associations whose members are either residents or property owners within the three FACE areas of the City of San Francisco. The purpose of these associations is to foster neighborhood improvement and, particularly, to act as liaison to the city and federal officials administering the FACE program.

---

3. *See* 42 U.S.C. § 1452b (1970).

Defendant Roy L. Ash is Director of the Office of Management and Budget and defendant Earl M. Butz is Secretary of Agriculture. In his capacity as Secretary of Agriculture, defendant Butz is charged with the administration of REAP. The FACE program is administered by the Secretary of Housing and Urban Development, defendant James T. Lynn.

## BACKGROUND

*I. REAP.* The Rural Environmental Assistance Program (REAP) has been conducted in one form or another by the Department of Agriculture since 1936. The basic purpose of the program is:

> "to secure . . . (1) preservation and improvement of soil fertility; (2) promotion of the economic use and conservation of land; (3) diminution of exploitation and wasteful and unscientific use of national soil resources; (4) the protection of rivers and harbors against the results of soil erosion in aid of maintaining the navigability of waters and water courses and in aid of flood control; (5) reestablishment . . . of . . . the purchasing power of the net income per person on farms . . . (6) prevention and abatement of agricultural-related pollution." [4]

The federal government encourages these goals by sharing with farmers the costs of carrying out environmental practices directed to "soil restoration, soil conservation, the prevention of erosion, or the prevention or abatement of agriculture-related pollution . . . ." [5]

Within the Department of Agriculture, REAP is administered by the Agricultural Stabilization and Conservation Service (ASCS). The ASCS, in conjunction with other divisions of the Department of Agriculture and other federal agencies, formulates long-range plans of national environmental needs. On the basis of these plans, appropriated funds are allocated each year to the states for cost-sharing. The ASCS also defines the "conservation practices"[6] which are in accord with the year's national priorities, as well as the maximum cost-sharing percentages for such practices. Each state has a REAP committee and within each state are county committees. The state and county committees, in conjunction with other state and federal agencies, develop state and county REAP plans. Each plan may include additional practices and alter the percentage of federal cost-sharing. Only after approval of state and county plans by the Department of Agriculture may individual farmers submit proposals to their county committees. If an individual farmer's application is approved, the federal government shares in the cost of executing the "practice" up to the applicable local percentage, subject to an overall maximum contribution of $2,500.[7]

The funds for REAP are not appropriated by Congress in advance of expenditure.[8] Rather, each year Congress authorizes a fixed dollar upper limit on the amount of funds that the Secretary of Agriculture may obligate in the upcoming REAP program year. At the close of the program year Congress appropriates sufficient funds to liquidate the cost-sharing obligations entered into during that year. Since fiscal 1959, the President and Congress have disagreed over the level of REAP funding. Contract authority enacted by Congress during each succeeding year has significantly exceeded the amount recommended by the President. In the 1973 fiscal year budget, the President requested $140 million for REAP; Congress responded by enacting obligational

---

4. 16 U.S.C. § 590g(a) (1970).

5. 16 U.S.C. § 590h(b)(1) (1970).

6. *See* 7 C.F.R. §§ 701.71–701.82 (1973).

7. *See* 7 C.F.R. § 701.46 (1973).

8. "The term 'appropriations' includes, in appropriate context, funds and authorizations to create obligations by contract in advance of appropriations, or any other authority making funds available for obligation or expenditure." 31 U.S.C. § 2 (1970).

authority of $225.5 million.[9] Despite this fact, the Department of Agriculture announced on September 29, 1972, that the 1973 REAP program level would be $140 million in order to reduce federal spending to control inflation. In December, 1972, REAP was ordered terminated by the Office of Management and Budget and the Department of Agriculture so as to limit fiscal 1973 federal expenditures to $250 billion. The decision was also based on the belief that REAP was of low priority, since the income supplements provided were no longer deemed necessary due to rising farm incomes. As a result of the decision to terminate REAP, defendant Ash has withheld from allotment and obligation all REAP contract authority for program year 1973 that was not obligated prior to December 22, 1972. The total amount thus withheld is $210,500,000.[10]

*II. FACE.* In the Housing Act of 1949, Congress announced a national housing policy and declared as its goal "the realization as soon as feasible of . . . a decent home and a suitable living environment for every American family."[11] The Federally Assisted Code Enforcement Program (FACE) is one method chosen by Congress to achieve that goal. Administered by the Department of Housing and Urban Development, FACE is aimed at slum prevention through the enforcement of local housing codes and the rehabilitation of declining neighborhoods. As part of the FACE program authorized by section 312 of the Housing Act, the federal government, utilizing local and private agencies where feasible, makes low-cost, long-term housing rehabilitation loans to property owners and tenants in FACE-designated areas.[12] These loans may not exceed twenty years or three-fourths of the remaining economic life of a structure after rehabilitation and may not bear interest at a rate in excess of three percent per annum.[13] In addition, loans are restricted to those individuals whose incomes fall below limits determined by the Secretary.

Section 312 loans and certain other costs of the program are paid out of a revolving fund which consists of both congressional appropriations and loan repayments.[14] Until fiscal 1972 all appropriations for the program were expended during the fiscal year. In the fiscal 1972 budget request the President recommended $40 million for the program and, although Congress appropriated $90 million, over $50 million remained uncommitted at the close of the fiscal year. The President's fiscal 1973 budget request contained a recommendation that no funds be appropriated for section 312 rehabilitation loans. Congress again disagreed with the President and appropriated $70 million for the program.[15] On February 5, 1973, the Office of Management and Budget filed a report with Congress pursuant to the Federal Impoundment and Information Act[16] which indicated that $50 million would be withheld from the program. The Office of Management and Budget stated that this action was necessary because "[e]xisting tax laws and the statutory limitation of the national debt (as provided under Public Law 92–599) will not provide sufficient funds in the current fiscal year to cover the total outlays in that year contemplated by the individual acts of Congress."[17]

---

9. Act of August 22, 1972, Pub.L. No. 92–399, tit. III, 86 Stat. 608.

10. 119 Cong.Rec. S2013 (daily ed. Feb. 5, 1973).

11. 42 U.S.C. § 1441 (1970). Congress reaffirmed the goals of this national housing policy in 1968. *See* 42 U.S.C. § 1441a (1970).

12. 42 U.S.C. § 1452b (1970).

13. 42 U.S.C. § 1452b(c) (1970).

14. 42 U.S.C. § 1452b(d) (1970).

15. Act of August 14, 1972, Pub.L. No. 92–383, tit. I, 86 Stat. 542.

16. 31 U.S.C. § 581c–1 (1970); *see* Report Under Federal Impoundment and Information Act, 38 Fed.Reg. 3474, 3485 (1973).

17. 38 Fed.Reg. 3475, 3485 (1973).

When this action first came before the court, the authorization for section 312 was to terminate on June 30, 1973. Congress, however, extended the life of the section 312 loan program until October 1, 1974.[18] As a result of this congressional action, the President directed the Secretary of Housing and Urban Development to make available up to $60 million in section 312 rehabilitation loans. Consequently, defendants moved to dismiss this action as moot insofar as it involved FACE funds. In response, plaintiffs contended that approximately $19 million still remained impounded by the Office of Management and Budget. The supplemental memoranda submitted by the parties indicate that plaintiffs are correct and that that portion of the section 312 revolving fund consisting of loan repayments and other income has not been and will not be made available for obligation by the Department of Housing and Urban Development.

### DISCUSSION

I. *Jurisdiction.* Defendants contend that this court lacks the requisite jurisdiction because the doctrine of sovereign immunity bars the suit and because the action fails to present a justiciable case or controversy. Identical arguments were rejected earlier this year in similar contexts in New York v. Ruckelshaus,[19] Local 2677, AFGE v. Phillips,[20] and most recently in National Council of Community Health Centers, Inc. v. Weinberger.[21] The court believes that the reasoning of those decisions applies with equal force here and that no purpose would be served by repeating what has already been discussed in depth. Suffice it to say that this case is not an unconsented suit against the United States, that it does not involve a political question, and that judicially manageable standards are not lacking to guide the court. The court finds that

the issues presented by this case are ripe for judicial resolution. With regard to defendants' motion to dismiss, the facts clearly indicate that the Executive is consciously withholding funds from the section 312 loan program. Therefore, the case is not moot and defendants' motion must be denied.

II. *The Merits.* Plaintiff Scarbrough challenges the termination of REAP. In addition to declaratory relief, he requests an order restraining defendant Ash from releasing less than the entire obligational authority made available by Congress to the Secretary of Agriculture, and an order restraining defendant Butz from terminating REAP and from refusing to allot the available obligational authority to local administrative units in accordance with applicable statutes and regulations. The remaining plaintiffs object to the reduction of the FACE program and request a declaratory judgment and order restraining defendant Ash from releasing less than the entire section 312 revolving fund to defendant Lynn. They also ask the court to enjoin defendant Lynn from refusing to make available section 312 loans to qualified applicants.

Plaintiffs contend that the termination of REAP and the impoundment of FACE funds by the Executive are unconstitutional assumptions of the legislative power of Congress. Plaintiffs argue that in deciding which programs to terminate or reduce, defendants necessarily made value judgments as to the need for or the effectiveness of particular programs. Since these determinations are made by Congress when it enacts legislation, plaintiffs argue that unless the veto is exercised the Executive may not refuse to implement a program because it considers the program fiscally unwise. To hold otherwise, it is claimed, would be to confer upon the Executive a power denied him by the Con-

---

18. Act of October 2, 1973, Pub.L. No. 93–117, § 10, 87 Stat. 423. Congress had previously enacted an interim extension. Act of August 10, 1973, Pub.L. No. 93–85, § 4, 87 Stat. 221.

19. 358 F.Supp. 669, 673–676 (D.D.C.1973).

20. 358 F.Supp. 60, 65–69 (D.D.C.1973).

21. 361 F.Supp. 897, 900–901 (D.D.C.1973).

stitution, the item veto. In support of their position that the defendants are without statutory authority to terminate REAP or impound FACE funds, plaintiffs point to the fact that Congress specifically refused to grant the President the discretion to reduce the level of any government program to maintain an expenditure ceiling, which it had given him in 1969, 1970, and 1971.[22]

Plaintiffs also point out that Congress, in section 203(a) of the Economic Stabilization Act of 1970, provided the President with broad powers to control inflation.[23] Finally, plaintiffs rely on the language of the authorizing statutes and the relevant appropriations acts as an indication of congressional intent that REAP and FACE to be operated at a full funding level.

Defendants pose the issue presented by this case as whether Congress, when it enacted the authorizing legislation, required the Executive to expend all of the funds appropriated. Defendants rely on the language of the relevant statutes and legislative history and argue that the defendants are invested with discretion to operate REAP and FACE at any level they deem appropriate. In addition to their statutory argument, defendants argue that the Constitution vests the Executive with broad powers of fiscal management, including the power to impound funds appropriated by Congress.

In defense of the termination of REAP, defendants urge upon the court several provisions of the Soil Conservation and Domestic Allotment Act of 1936 and the fiscal 1973 appropriations act providing funds for REAP. Specifically, they rely on two provisions which appear in Title 16 of the United States Code; section 590o which provides:

> "To enable the Secretary of Agriculture to carry out the purposes of sections 590g and 590h of this title there is authorized to be appropriated for any fiscal year not exceeding $500,000,000."

and section 590p(a):

> "The obligations incurred for the purpose of carrying out, for any calendar year, the provisions of sections 590g, 590h, 590i, and 590j–590n of this title shall not exceed $500,000,000."

Defendants assert that this language confers on the Executive the authority to decide how much is to be spent from the actual appropriations. To bolster this assertion, defendants cite the legislative debate surrounding the enactment of these sections.[24] While this contention is not totally devoid of merit, it overlooks several significant facts. From 1936, the year the act was passed, until 1943, the program was operated without specific advance authorizations so that it necessarily had to be conducted within the maximum legislative authorization of $500 million. From program year 1944 until the present, however, each REAP program year has been preceded by an advance congressional authorization. When this fact is taken into consideration and if the ordinary and plain meaning is given to the language of the above-quoted sections,[25] it seems clear that section 590o is a self-imposed limitation on the amount which Congress may later appropriate, when and if it enacts a subsequent appropriations bill.[26] Thus, Section 590o speaks

---

22. Fiscal 1969: Act of June 28, 1968, Pub. L. No. 90–364, §§ 202, 203, 82 Stat. 271, 272. Fiscal 1970: Act of July 22, 1969, Pub.L. No. 91–47, § 401, 83 Stat. 82; Act of July 6, 1970, Pub.L. No. 91–305, § 401, 84 Stat. 405. Fiscal 1971: *Id.* at § 501, 84 Stat. 406.

23. Act of Dec. 22, 1971, Pub.L. No. 92–210, tit. II, 85 Stat. 744, 12 U.S.C.A. § 1904 note (1970).

24. *See* 80 Cong.Rec. 1571, 1572, 1773–74, 1779; H.R.No.2079, 74th Cong., 2d Sess. 12 (1936).

25. *See* Minor v. Mechanic's Bank, 1 Pet. (26 U.S.) 46, 63, 7 L.Ed. 47 (1828).

26. Legislation creating a new program is a two-stage process. Authorization bills merely provide the authority for programs. The Congress must still appropriate funds in an appropriations bill before the program can be operated.

to a limitation on Congress and not the Secretary of Agriculture. While section 590p(a) is more clearly applicable to the Secretary of Agriculture and the obligations he may incur, the importance of this provision is reduced by the above-mentioned change in congressional procedure, and in any case does not clearly impart discretion to the Secretary.

An award of discretion also might be found in the language of the fiscal 1973 appropriations bill for REAP,[27] which in providing obligational authority states that "necessary amounts *shall be available*"[28] for REAP "amounting to $225,500,000."[29] However, when read in conjunction with the remaining provisions of section 590o, the grant of discretion becomes questionable:

> "Notwithstanding the foregoing provisions of this section . . . programs of soil building practices, soil- and water-conserving practices . . . *shall be based on a distribution of the funds available*[30] for payments and grants among the several states in accordance with their conservation needs, as determined by the Secretary, except that the proportion allocated to any state shall not be reduced by more than 15 per centum from the distribution of such funds for the next preceding program year."

Plaintiff argues that the "funds available for payments" referred to in section 590o upon which a distribution among the several states "shall be based" can only be the full $225.5 million that the fiscal 1973 appropriations act states "shall be available." Despite such unequivocal assertions and the analysis

suggested by the parties, the meaning of these provisions remains unclear.

■■ Although the language of the statute and the relevant legislative history do not preclude the existence of discretion in the Secretary to limit the size of REAP, the court is of the opinion that the defendants are without power to terminate the program.[31] Plaintiff readily concedes that the statute invests the Secretary of Agriculture with discretion to determine which farmers shall receive REAP benefits, in what amount, and for which practices.[32] However, this is the only discretion that clearly has been given to the Secretary and its function is to enable him to effectuate the goals of the program. Even assuming the existence of a broader discretion, the termination of REAP cannot stand. In State Highway Commission of Missouri v. Volpe,[33] the Eighth Circuit held that the Secretary of Transportation could not withhold funds from state highway programs for reasons remote and unrelated to those which the Congress had established:

> "To reason that there is implicit authority within the Act to defer approval for reasons totally collateral and remote to the Act itself requires a strained construction which we refuse to make. It is impossible to find from these specific grants of authority discretion in the Secretary to withhold approval on projects Congress has specifically directed because of a system of priorities the Executive chooses to impose on all expenditures. The Congressional intent is that the Secretary may exercise his discretion

27. *See* note 9 *supra.*

28. Defendants' emphasis.

29. *See* note 9 *supra.*

30. Plaintiff's emphasis.

31. Even if the court did not face the question of the Secretary's authority to terminate REAP, it would be forced to conclude that the defendants have violated the statute. Section 590o, quoted above, provides that the proportion of funds allocated to any

state may not be less than 85 percent of the state's proportional share received in the preceding program year. Plaintiff's Exhibit B, which has not been contradicted by the defendants, indicates that the proportion of funds received by several states in 1973 is less than 85 percent of that received in 1972.

32. *See* 16 U.S.C. § 590h (1970).

33. 479 F.2d 1099 (8th Cir. 1973).

to insure that the roads are well constructed and safely built at the lowest possible cost, all in furtherance of the Act, but when the impoundment of funds impedes the orderly progress of the federal highway program, this hardly can be said to be favorable to such a program. In fact, it is in derogation of it. It is difficult to perceive that Congress intended such a result." [34]

It is undisputed that the decision to terminate REAP was made jointly by the Office of Management and Budget and the Department of Agriculture. The Office of Management and Budget stated that REAP was being terminated because "[e]xisting tax laws and the statutory limitation of the national debt . . . will not provide sufficient funds . . . to cover the total of all outlays . . . ." [35] Whatever the merit of this statement, it is clearly a reason "collateral and remote" to the purposes of REAP and falls within the prohibition of *Volpe*. On December 26, 1972, when the Department of Agriculture announced the termination of REAP it gave as its reasons:

> "The income supplements for farmers that have been provided by the REAP . . . are no longer necessary . . . . Realized net farm income in 1972 will reach an all-time high of nearly $19 billion. In view of this, and because of the general acceptance and profitability of certain practices, it is believed farmers will continue to implement a significant number of them without supplemental income from the Federal government." [36]

While these latter reasons are more obviously related to REAP, termination "hardly can be said to be favorable to such a program." [37] When Congress has declared that it is "to be the policy [of REAP] . . . to secure, and the

purposes of this chapter shall also include, (1) preservation and improvement of soil fertility . . . ," [38] termination of REAP insures that this policy objective will not be secured. When Congress has stated that "[t]he powers conferred under this section and sections 590h, 590i, and 590j–590n of this title shall be used to assist voluntary action calculated to effectuate the purposes specified," [39] termination is contrary to the intent of Congress. Where the "Secretary is directed to utilize the services of local and State committees," [40] termination of the program will prevent these committees from being so used.

■ Congress, by authorizing the future obligation of funds by the Secretary of Agriculture, has indicated its intent that the program continue, at least for the period of time authorized. To accept the defendants' position, that absent a mandatory statement that a program be continued or be operated at a certain level the Executive may terminate the program, would be to place a burden on the Congress not contemplated by our Constitution. The Constitution vests in the Congress "[a]ll legislative powers." The Executive may not alter that power and force the Legislature to act to preserve a legislative program from extinction prior to the time that Congress has declared it shall terminate.

> "An authorization does not necessarily mean that a program will continue. Congress, of course, may itself decide to terminate a program before its authorization has expired, either indirectly by failing to supply funds through a continuing resolution or appropriation, or by explicitly forbidding the further use of funds for the programs, as it did in the case of the supersonic transport. But Congress has not chosen either of these courses,

---

34. *Id.* at 1114.

35. 38 Fed.Reg. 3475, 3478 (1973).

36. Activities Under REAP and Water Bank Programs Terminated, U. S. Department of Agriculture Press Release (Dec. 26, 1972).

37. 479 F.2d at 1114.

38. 16 U.S.C. § 590g (1970).

39. *Id.*

40. 16 U.S.C. § 590h(b) (1970).

although it may in the future. Until that time, historical precedent, logic, and the text of the Constitution itself obligate the defendant to continue to operate the . . . programs as was intended by the Congress, and not terminate them." [41]

Congress has told the Director of the Office of Management and Budget and the Secretary of Agriculture through its authorization and appropriations that it intends REAP to continue. Until Congress changes that command, the defendants are bound to honor it.

■ Arguments identical to those raised with respect to REAP are pressed by the parties in support of their positions concerning the fate of impounded section 312 FACE funds. Defendants contend that the Secretary has discretion to determine the level of FACE funding, while plaintiffs deny the existence of such discretion. The parties focus on three sections of the Housing Act and the fiscal 1973 appropriations act for the section 312 loan program. The relevant provisions of section 312 cited by the parties are:

"(a) The Secretary is authorized, through the utilization of local public and private agencies where feasible, to make loans as herein provided . . . . " [42]

"(d) There is authorized to be appropriated not to exceed $150,000,000 for each fiscal year which shall constitute a revolving fund to be used by the Secretary in carrying out this section." [43]

The fiscal 1973 appropriations act provides:

"For the revolving fund established pursuant to section 312 of the Housing Act of 1964, as amended (42 U.S.C. § 1452b), $70,000,000, to remain available until expended." [44]

The plaintiffs offer the following provision of the Housing Act as a final indication of the Secretary's lack of authority to withhold section 312 loans:

"Notwithstanding any other provision of this subchapter . . . not less than 10 per centum of the aggregate amount of (i) grants authorized to be contracted for under this subchapter . . . and (ii) loans authorized to be made under section 1452b [section 312] of this title, shall be available for projects assisted with such grants or loans which involve primarily code enforcement and rehabilitation." [45]

While the meaning of the above provisions is not free from doubt, the court is satisfied that although defendant Lynn possesses discretion to determine which applicants are qualified to receive rehabilitation loans, he has no authority to decline to exercise this discretion. [46]

Congress has twice affirmed its intent to achieve the goals of the nation's housing policy and has twice extended the authorization for the section 312 program in the face of Executive impoundments. [47] This action by Congress clearly indicates its intent that the section 312 revolving fund be fully available for obligation by the Secretary of Housing and Urban Development. That Congress intended the entire revolving fund, including loan repayments and interest, to be available for section 312 loans is made clear by the report of the

41. Local 2677, AFGE v. Phillips, 358 F.Supp. 60, 75–76 (D.D.C.1973) (footnotes omitted).

42. 42 U.S.C. § 1452b(a) (1970).

43. 42 U.S.C. § 1452b(d) (1970).

44. Act of August 14, 1972, Pub.L. No. 92–383, tit. I, 86 Stat. 542.

45. 42 U.S.C. § 1460(c) (1970).

46. "We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence or member of a sentence but [should] look to the provisions of the whole law, and to its object and policy.'" Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962) (footnotes omitted).

47. *See* note 11 *supra* and accompanying text.

House Appropriations Committee concerning fiscal 1973 FACE appropriations:

"An appropriation of $90,000,000 was provided for the current [1972] fiscal year. When taken together with the $11,000,000 of expected loan repayments and other revenues, it would provide for a total program of $101,000,000." [48]

This case does not present a situation where congressionally mandated objectives can be achieved with unforeseen efficiency or economies. All parties agree that the demand for rehabilitation loans exceeds the available funds and that the goal of a "decent home and a suitable living environment for every American family" has not been accomplished. It is to state the obvious to conclude that the policy of the Housing Act will not be promoted by restricting the source of admittedly inadequate funds. In fact, such a reduction is in derogation of that policy. The announced reason for reducing the availability of FACE funds was totally unrelated to the purposes of the program, and as discussed above, the Executive may not withhold funds from projects which the Congress has specifically directed because of such extraneous considerations.

Defendants ultimately argue in defense of the reductions in both programs that the Executive has "inherent power" to impound congressionally appropriated funds to achieve the goals set by the Legislature and "at the same time protect the economic stability of the Nation, the national position in Foreign Affairs and the needs of the National Defense." [49] This power is said to arise from those sections of Article II which provide that "[t]he executive power shall be vested in a President" and that the President "shall take care that the laws be faithfully executed." Identical claims were raised by the Executive in Youngstown Sheet & Tube Co. v. Sawyer. [50] There, the Supreme Court held:

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make the laws which the President is to execute.

. . . . . .

The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times." [51]

Defendants' argument that to "limit the authority of the President to execute all of the laws in the overall manner he finds necessary would substantially undercut his authority to combat inflation, unemployment and other economic problems" [52] may well be true. [53] However, nowhere does our Constitution extol the virtue of efficiency and nowhere does it command that all our laws be fiscally wise. It does most clearly, however, state that laws, good or bad, be enacted by the Congress and enforced by the President. "[I]f the power sought here were found valid, no barrier would remain to the executive ignoring any and all Congressional authorizations if

48. H.R.Rep.No.92–1071, 92d Cong., 2d Sess. 11 (1972).

49. Defendants' Memorandum, at 45.

50. 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

51. *Id.* at 587–589, 72 S.Ct. at 867.

52. Defendants' Memorandum, at 51.

53. Mr. Justice Jackson cautioned in this regard: "The opinions of judges, no less than executives and publicists, often suffer the infirmity of confusing the issue of a power's validity with the cause it is invoked to promote, of confounding the permanent executive office with its temporary occupant. The tendency is strong to emphasize transient results upon policies—such as wages or stabilization—and lose sight of enduring consequences upon the balanced structure of our Republic." 343 U.S. at 634, 72 S.Ct. at 869.

he deemed them, no matter how conscientiously, to be contrary to the needs of the nation." [54] Money has been appropriated by the Congress to achieve the purposes of both programs and the Executive has no residual constitutional power to refuse to spend these appropriations.[55] Accordingly, plaintiffs' motion for summary judgment is granted and defendants' cross-motion for summary judgment is denied.

## CONCLUSION

Contrary to defendants' assertions, this decision does not destroy the Executive's ability to combat inflation or control the economy. The Congress has provided the President with the means "to stabilize the economy, reduce inflation, minimize unemployment, improve the Nation's competitive position in world trade, and protect the purchasing power of the dollar." [56] In enacting the Economic Stabilization Act of 1970 [57] Congress recognized the need for prompt, decisive action upon which the defendants premise the necessity for impoundment.[58] It gave the President the authority to act, but specifically stated that "[n]othing in this title may be construed to authorize or require the withholding or reservation of any obligational authority provided by law or of any funds appropriated under such authority." [59] Nor does this decision confront the President with the "dilemma of competing and conflicting directives by Congress—on the one hand to

spend, and on the other to remain within fiscal limitations." [60] If it appears that government expenditures will exceed receipts as a result of the continued operation of REAP and FACE at full funding, the Budget and Accounting Act of 1921 provides that the President "transmit to Congress such proposed supplemental or deficiency appropriations as in his judgment (1) are necessary on account of laws enacted after the transmission of the Budget, or (2) are otherwise in the public interest." [61] The record before the court does not indicate that any such recommendations have been made.

Plaintiffs, therefore, are entitled to a declaratory judgment that the termination of REAP and the impoundment of FACE funds are unauthorized by law and that all actions taken by defendants in furtherance of those ends are null and void. Plaintiffs are further entitled to an order restraining defendants from implementing or enforcing any rules, regulations or other communications intended to terminate REAP or limit the availability of section 312 loans, and directing defendants to annul and revoke by official act any such extant rules, regulations or communications. This order will also direct defendants Butz and Lynn to accept and process applications for REAP cost-sharing benefits and section 312 loans pursuant to applicable statutes and regulations. An appropriate final order accompanies this memorandum opinion.

54. Local 2677, AFGE v. Phillips, 358 F.Supp. 60, 77 (D.D.C.1973).

55. *See, e. g.*, Youngstown Sheet & Tube v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); State Highway Comm'n v. Volpe, 479 F.2d 1099 (8th Cir. 1973); National Council of Com. Mental H. Ctrs., Inc. v. Weinberger, 361 F.Supp. 897 (D.D.C. 1973); Local 2677, AFGE v. Phillips, 358 F.Supp. 60 (D.D.C.1973).

56. Economic Stabilization Act of 1970, Pub. L. No. 92–210, tit. II, 85 Stat. 744, 12 U.S. C.A. § 1904 note (1970).

57. *Id.*

58. "The adjustments necessary to carry out this program require prompt judgments and actions by the executive branch of the Government. The President is in a position to implement promptly and effectively the program authorized by this title." *Id.* at § 202, 85 Stat. 744.

59. *Id.* at § 203(j), 87 Stat. 28.

60. Defendants' Memorandum, at 67.

61. 31 U.S.C. § 14(a) (1970); *see id.* at § 13.