**Willie Ole Knute KJELDAHL, et al., Plaintiffs,**

v.

**John BLOCK, Secretary of Agriculture, Defendant.**

**Civ. A. No. 82–2745.**

United States District Court, District of Columbia.

Aug. 29, 1983.

Douglas B. Huron, Stein & Huron, Washington, D.C., for plaintiffs.

Neil H. Koslowe, Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

FLANNERY, District Judge.

This matter is before the court on cross-motions for summary judgment. Plaintiffs contend that defendant Secretary of Agriculture ("Secretary") in fiscal year ("FY") 1982 unlawfully refused to implement the program of guaranteed and insured loans created by the Emergency Agricultural Credit Adjustment Act of 1978, as amended, 7 U.S.C. prec. 1961 note (the "Act"). The Secretary argues that the Act gave him the discretion to determine whether or not economic emergency conditions existed which warranted issuance of loan guarantees under the Act, and that he exercised his discretion reasonably in refusing to authorize any such guarantees in FY 1982.

On September 28, 1982 Judge Joyce Hens Green granted plaintiffs' motion for a temporary restraining order and enjoined the Secretary from making any disbursements from the Agricultural Credit Insurance Fund (the "Fund"), created pursuant to 7 U.S.C. § 1929, which would deplete the Fund below $600 million—the total of loans which the act authorized the Secretary to guarantee or insure in FY 1982. On October 26, 1982 this court denied plaintiffs' motion for a preliminary injunction, finding that plaintiffs had failed to demonstrate irreparable injury in the absence of injunctive relief, for two reasons. Although the Secretary's authority under the Act to insure or guarantee loans expired on September 30, 1982, if the court finds that he unlawfully failed to act while he still enjoyed that authority, he may exercise it pursuant to court order. *Jacksonville Port Authority v. Adams*, 556 F.2d 52, 56–57 (D.C.Cir.1977). And the "revolving" nature of the Fund is such that there is no danger of it being depleted. Consequently, even without preliminary injunctive relief, plaintiffs will be able to receive any relief to which they are entitled.

The parties argued their cross-motions for summary judgment on November 17, 1982. On November 29, 1982, the court ordered the Secretary to submit supplemental affidavits and memoranda detailing the data considered by the Secretary and the frequency and manner of his consideration, in order to permit the court to properly review the reasonableness of the Secretary's decision. The Secretary submitted his supplemental memoranda on December 15, 1982. Plaintiffs responded to the supplemental submission on January 14, 1983.

For the reasons set forth below, upon careful consideration of the entire record in this case, the court shall grant plaintiffs' motion for summary judgment and deny that of defendant.

*Background*

In 1978 Congress enacted the Emergency Agricultural Credit Adjustment Act, Pub.L. No. 95–334, 92 Stat. 429 (1978), 7 U.S.C. prec. 1961 note, creating an economic loan guarantee program. Congress sought to address "the most stressed economic conditions which have prevailed for decades" in American agriculture. H.R.Rep. No. 986, 95th Cong., 2d Sess. 12 (1978), U.S.Code Cong. & Admin.News, pp. 1106, 1117. Noting that farmers suffered from declining income, sagging commodity prices, increased production costs, and low crop yields, Congress found a need for economic emergency loans analogous to those loans which were available to farmers who were victims of natural disasters. *Id.* at 14–15. Existing programs were inadequate, Congress found, because farm ownership and operating loans could be made only to family farmers, and historically, insufficient funds existed to meet the demands for ownership loans. *Id.* at 15.

Under Section 202 of the Act, Congress authorized the Secretary of Agriculture to guarantee or insure loans made to bona fide farmers—including farm cooperatives, corporations, or partnerships—who had adequate experience or training, needed credit, and were unable to obtain sufficient credit from private sources due to economic stresses. Section 205 of the Act required that the private lender and the farmer certify that credit could not be obtained in the absence of the federal guarantee. The Act limited the total amount of loans which could be insured or guaranteed through the end of 1979 to $4 billion.

In 1980 Congress voted to extend the program through September 30, 1981 and to increase the ceiling to $6 billion. Pub.L. No. 96–220, 94 Stat. 129 (1980). The program had been created, Congress noted, at a time of severe financial stress for farmers and, Congress concluded, "[t]oday there remains a critical need for the type of credit provided by the Act." H.R.Rep. No. 782, 96th Cong., 2d Sess. 4 (1980). Net farm income was down, reducing farmers' ability to repay existing debt and increas-

ing their need for refinancing, at a time when production costs were rising rapidly and banks suffered from a scarcity of funds with which to make loans. *Id.* Congress sought to tighten administration of the program, however, and so added a requirement that each applicant submit one written refusal of credit from a private lender. Congress further directed the Secretary to prepare a comprehensive report on the program's effectiveness.

The Secretary submitted his report in January 1981, concluding that the program had fulfilled its basic objectives, but that it was no longer necessary for two reasons. First, credit conditions had improved; second, any need for credit which might exist could be met by increasing the funding in existing operating and farm ownership loan programs. U.S. Department of Agriculture, Farmers Home Administration, *Economic Emergency Farm Loan Program Evaluation Study Report* 25–27 (1981).[1]

Later in 1981, as the program approached expiration, Congress was divided as to its extension. The Senate passed an omnibus farm bill which did not include an extension of the economic loan program. S.Rep. No. 97–126, 97th Cong., 1st Sess. (1981), U.S.Code Cong. & Admin.News, p. 1965. The House of Representatives, on the other hand, included in its version of the 1981 farm bill an amendment to the Act which simply extended the program for one year, until September 30, 1982. No mutually agreeable version of the farm bill was passed, however, before the end of the fiscal year, and consequently the Secretary's authority to make economic emergency loans expired on September 31, 1981.

A conference committee met to reconcile the conflicting farm bills and compromised on the extension of the economic emergency loan program by extending it until September 30, 1982, but limiting the amount of loans which could be guaranteed or insured in any one fiscal year to $600 million and including in the Conference Report the following limiting language:

1. The report is attached as Attachment 1 to defendant's motion for summary judgment.

The Emergency Agricultural Credit Adjustment Act of 1978 provides the Secretary broad authority to determine the scope of the economic emergency loan program and eligibility for participation in the program in accordance with the Act's provisions. The statute creates no entitlement for farmers to receive loans and is discretionary in nature. It is the intent of the conferees, in agreeing to an extension of the Act, that the Secretary judiciously use the authority to insure and guarantee loans to farmers under the Act. Of course, the conferees intend that the Secretary use the authority in the Act to cope with economic emergencies.

H.R.Rep. No. 377, 97th Cong., 1st Sess. 270 (1981), U.S.Code Cong. & Admin.News, p. 2367. As agreed to by the conferees, the extension of the Act was passed by Congress on December 22, 1981. Pub.L. No. 97–98, 95 Stat. 1213 (1981). Despite the extension, however, the Secretary made no economic emergency loans under the Act in FY 1982. It is this refusal which plaintiffs challenge in this action.

*Discussion*

A. *Motion for class certification*

Plaintiffs have moved for certification of a class which would include essentially all farmers and ranchers who meet the eligibility criteria enumerated in the Act: being primarily and directly engaged in agriculture, having the requisite training or experience, needing credit and unable to obtain it in the absence of the federal guarantee or insurance. Defendants oppose the motion for class certification, arguing that the only plaintiffs with standing would be those farmers who applied for loans under the program and were rejected, or inquired about the program and were told it had been terminated, or those who by the Secretary's actions were discouraged from applying or inquiring. To determine the contours of the class would require an inquiry into the state of mind of each potential class member, argues defendant, rendering this controversy inappropriate for class resolution.

The court finds that the proposed class is properly certifiable under Fed.Rule Civ.Pro. 23(b)(1) or 23(b)(2). In the three years the program did operate more than 67,000 farmers participated, and there is no reason to believe that a proportionately large number would not have participated had the program been implemented by the Secretary during the approximately nine months of its extension. Consequently, the class is so numerous as to make joinder impracticable. The common questions of law and fact all turn on the legality of the Secretary's admitted refusal to implement the program. Defendant does not contest the named plaintiffs' ability to prosecute this action to protect the interests of the class fairly and adequately. Prosecution of separate actions could result in inconsistent adjudications, and the Secretary has refused to act—has refused to implement the program—on grounds applicable to the class generally.

Defendant's contention that the motion should be denied because of the difficulty of identifying precisely all the members of the class is without merit. Plaintiffs seek a reopening of the program for a period of time equal to that for which it was extended by Congress in 1981. Procedures governing the program require farmers seeking its benefits to file written applications certifying that they are indeed bona fide farmers or ranchers as defined by the Act, have proper training or experience, need credit and cannot otherwise obtain it. Through the application and certification process, therefore, the Secretary will be able to identify class members. Defendant's suggestion that the parties and the court will have to engage in ephemeral inquiries into the state of mind of class members between December 22, 1981 and September 30, 1982 is without foundation. If the Secretary unlawfully refused to implement the economic loan program, in fashioning an equitable remedy the court will not be bound by the strictures urged by the defendant. Instead, the court has the power to order the Secretary to reopen the program and process applications. *See Guadamuz v. Ash,* 368 F.Supp. 1233 (D.D.

C.1973); *Commonwealth v. Lynn,* 362 F.Supp. 1363 (D.D.C.1973), *rev'd on other grounds,* 501 F.2d 848 (D.C.Cir.1974). Of course, only those applicants who meet the statutory requirements will be entitled to receive assistance under the Act.

## B. *Discretion of the Secretary under the Act*

Plaintiffs argue that the Secretary's refusal to implement the Act in FY 1982 was contrary to law and beyond the scope of his authority because he enjoyed no discretion under the Act to refuse to guarantee or insure economic emergency loans. Congress made a finding in passing the Act in 1978, say plaintiffs, that an economic emergency existed, and left no authority in the Secretary to find to the contrary. They point to the legislative history of the original Act and its 1980 extension, both of which describe the severe financial hardships faced by farmers. *See* H.R.Rep. No. 986, 95th Cong., 2d Sess. 11–13 (1978); H.R.Rep. No. 782, 96th Cong., 2d Sess. 4–5 (1980). The relevant portion of the section-by-section analysis of the Act in the 1978 report states that the Act "authorizes *and directs* the Secretary of Agriculture to provide financial assistance through insured or guaranteed loans ...." H.R.Rep. No. 986, 95th Cong., 2d Sess. 47 (1978) (emphasis added). The only discretion the Secretary did have, contend plaintiffs, was to refuse particular individual applicants who failed to meet the certification criteria required by the Act.

Plaintiffs' argument, though not without force, is not persuasive. Despite the force of the language in the legislative history describing farmers' dire conditions, several elements indicate that Congress intended to leave the Secretary a broader measure of discretion than plaintiffs would allow. Although in the 1978 report Congress "directs" the Secretary to provide assistance, the statute itself in Section 202 provides that "[t]he Secretary of Agriculture *may* insure or guarantee loans ...." (Emphasis added). And that section of the legislative history which "directs" the Secretary to provide assistance says it must go to those who "are unable at the time the

application is filed to obtain sufficient credit from their normal credit sources to finance their needs at reasonable rates and terms." H.R.Rep. No. 986, 95th Cong., 2d Sess. 47 (1978), U.S.Code Cong. & Admin. News, p. 1152. Presumably, then, the Secretary had the authority to determine that no assistance would be provided because rural banks had sufficient funds to provide credit at reasonable rates and terms.

Furthermore, Congress explicitly modeled the Act after an earlier program which allowed the Secretary to provide financial assistance selectively. As described in the House report accompanying the original Act in 1978, from 1953 to 1961 the Farmers Home Administration had an economic emergency loan program which authorized the Secretary "to make emergency loans to farmers and ranchers in areas where *he found* that an economic disaster had caused a need for agricultural credit ...." *Id* at 15, U.S.Code Cong. & Admin.News, p. 1120 (emphasis added). Under that program then, the Secretary was free to direct the flow of aid to those particular needy areas where he determined an economic emergency existed. Congress displayed a similar sensitivity to the potentially unequal impact of financial stress in 1978, when it noted that:

> Average cost of production per unit of output is extremely variable from farmer to farmer and region to region. This accounts for some farmers being in a more critical financial position than others.

*Id.* at 13, U.S.Code Cong. & Admin.News, p. 1118. Just as in the earlier program, therefore, Congress intended to provide the Secretary with the discretion to pinpoint those areas most in need and to direct assistance accordingly.

■ In any event, whatever doubts which may have existed as to the Secretary's discretion were dispelled when Congress extended the program in 1981. As noted above, the House and Senate were split on the question of the program's extension. The compromise reached by the conferees extended the program, but made

clear the broad discretion in the Secretary to draw the limits of its implementation. The conferees stated that the Act "provides the Secretary broad authority to determine the scope of the economic emergency loan program." H.R.Rep. No. 377, 97th Cong., 1st Sess. 270 (1981), U.S.Code Cong. & Admin.News, p. 2367. The Act, they continued, "creates no entitlement for farmers to receive loans and is discretionary in nature." *Id.* More explicit support for the Secretary's position is hard to imagine. Accordingly, as to the first issue in this case, the court holds that under the Act the Secretary enjoyed broad discretionary authority to determine whether and to what extent economic conditions warranted implementation of the program.

### C. *The Secretary's exercise of his discretion*

▮ The discretion enjoyed by the Secretary is not, however, unbounded. To be sure, the standard of review is a highly deferential one, and the court may not substitute its judgment for that of the agency. *Environmental Defense Fund v. Costle*, 657 F.2d 275, 283 (D.C.Cir.1981). But the court, under the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 553 *et seq.*, must set aside agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For its decision to be sustained, "the agency must consider all of the relevant factors and demonstrate a reasonable connection between the facts on the record and the resulting policy choice." *Sierra Club v. Costle*, 657 F.2d 298, 323 (D.C.Cir.1981). To judge the reasonableness of the connection between the facts and the agency action the court "must engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'" *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 34 (D.C.Cir.1976) (en banc) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

In the case at bar, the Secretary first attempted to support his decision only by the affidavit of Frank W. Naylor, Jr., Under Secretary for Small Community and Rural Development of the Department of Agriculture. In his affidavit, attached to defendant's memorandum in support of his motion for summary judgment, Mr. Naylor states simply that on the basis of continuous monitoring of agricultural credit conditions, as well as consideration of guidelines previously identified to certain members of Congress, the Secretary and his staff concluded that no economic emergency loans should be made in FY 1982. The factors referred to were identified in correspondence with members of Congress, copies of which were attached to the first Naylor affidavit. They included (1) current loan to deposit ratios of rural banks in a particular state, (2) declines in a state's net farm income, (3) variations in the crop yields of the major crops within a state, and (4) a significant upward change in the number of classified loans held by conventional or farm credit system agricultural lenders in a state.

In an order dated November 29, 1982 this court ordered the Secretary to submit a supplemental affidavit which would demonstrate the type of data considered by the Secretary, the frequency and manner in which the data were collected and considered by the Secretary, as well as the underlying data presented to and considered by the Secretary or his designee ultimately responsible for the decision that no economic emergency loans would be made in FY 1982.

Although the Secretary protested that his first submission was adequate, on December 15, 1982 he responded to the court's order with another, longer affidavit from Mr. Naylor accompanied by thirteen voluminous attachments. In his second affidavit Mr. Naylor expanded the list of factors considered, adding to those above (1) whether credit was available from other lenders, (2) whether FmHA operating or emergency loans were available, (3) declines in a state's share of national net farm income, (4) whether a state was experiencing "abnormal economic stress",

and (5) the "overall health of agricultural credit."

According to his affidavit, Mr. Naylor obtained his data from a variety of sources in a variety of ways. He first lists meetings held throughout the year with various interested groups, including eight meetings with Farm Credit System entities, ten with representatives of the private banking sector, and four with what he labels "interested groups". Half of these meetings were conducted in connection with speeches given by Mr. Naylor to the concerned group. In addition, the Secretary established an ad hoc committee made up of private agricultural lenders which Naylor says met periodically to monitor the credit situation. Finally, Naylor regularly examined reports from various sources, including quarterly reports from the Farm Credit Administration which gave the results of the ad hoc committee's monitoring, periodic letters from the American Bankers Association outlining its analysis, monthly reports published by the Board of Governors of the Federal Reserve System entitled *Agricultural Finance Databook*, and briefing papers prepared for the Secretary by the Department of Agriculture Economic Research Service. Examples of the above reports are attached to Naylor's second affidavit.

■ Upon analysis of the factors listed by the Secretary and the data considered by him, the court finds that the Secretary's refusal to implement the economic emergency loan program in FY 1982 was arbitrary, capricious and an abuse of discretion. To begin with, at least two of the factors listed are of doubtful relevance in deciding whether an economic emergency exists in agriculture. First, variations in crop yields within a particular state, when considered alone and without any price component, say little about farmers' economic well-being. As plaintiffs point out, it is often during years of bountiful harvests that farmers are most hard-pressed, because the abundance of production drives prices down, even below costs of production. Furthermore, even assuming that variations in crop yields were relevant, the Secretary presented to the court no example of the particular, state-by-state data which he purported to consider. Instead, within the Secretary's submissions are only a few general references on a national scale, such as a reference to larger than expected corn, soybeans and spring wheat harvests found in the Farm Credit Administration's second quarter report. Second Naylor Affidavit, Attachment ("Att.") 4 at 3.[2]

Second, the Secretary initially said he would consider declines in a state's farm income, but later modified that slightly to say he would consider declines in a particular state's share of national net farm income. Presumably, then, the Secretary would have viewed an absence of decline in that share as a sign that no emergency existed in that state. But it is apparent that a particular state's farm income could decline in absolute terms, even while its percentage share of national farm income remained stable, if farm income as a whole dropped nationally. Consequently, both crop yields viewed in a vacuum and farm income viewed as a share of national income are both irrelevant to a determination of farmers' economic well-being.

More important, however, is the fact that to the extent that the remaining factors cited by the Secretary are relevant, the data submitted in the attachments to the second Naylor affidavit paint an unrelievedly bleak picture of the farmers' economic state in 1982, completely contrary to the Secretary's finding that no economic emergency existed.

For example, net farm income, when stated in absolute terms as the Secretary did in the first Naylor affidavit, is of course relevant to farmers' economic well-being. But the news about farm income received by the Secretary was all bad. On January 28, 1982, about one month after

---

**2.** All attachments hereinafter referred to are attached to Mr. Naylor's second affidavit, unless otherwise indicated.

Congress voted to extend the economic emergency loan program, and only one week after the Secretary announced the formation of his ad hoc committee to monitor agricultural credit, the Secretary received a briefing paper prepared by his staff entitled "Financial Conditions in the Farm Sector." The report began as follows:

> Farm sector financial conditions have deteriorated due to adverse developments in four important financial variables—farm income, interest rates, farm debt, and farm equity. During the last two years net farm income has been at depressed levels and is expected to decline further this year. Cash flow problems exist for almost every type of farm and region. Farmers have historically utilized credit, made available to them because of growing farm equity, to fill the cash flow gap produced by periodic slumps in farm income. However, the price of this credit (interest rate) has risen dramatically above historic levels in the last two years and, despite some recent easing, is expected to remain high in 1982.
>
> \*   \*   \*   \*   \*   \*
>
> Farm sector income has been at depressed levels for two consecutive years, and prospects for 1982 are bleak. Current USDA forecasts for net farm income suggest a decline of about 37 percent to $14.4 billion in 1982.
>
> Net cash income is expected to fall for the third consecutive year to $25.9 billion, a 12 percent decrease from 1981 levels.

Att. 12 at 1.

Nor did conditions improve in the course of the year. On May 28, 1982 the Farm Credit Administration submitted to the Secretary its report on farm credit conditions during the first quarter of 1982. The report noted that "farm income prospects have not changed significantly in the past several months" and described a "serious weakness in the farm income picture."

Att. 3 at 1, 2. Only days later a briefing paper prepared by the Secretary's staff stated that real net farm income had dropped 46 percent from 1979 to 1980, had remained unchanged through 1981, and was expected by some to experience a sharp decline in 1982. Att. 13 at 7. Consequently, "many [lenders] have indicated that if farm income does not improve in 1983, conditions could indeed become very serious." *Id.* at 1.

The American Bankers Association concurred. On June 15, 1982, the ABA sent the Secretary a letter saying that since the first meeting of the Secretary's ad hoc committee in January,

> agriculture's economic situation has not improved. Although livestock prices overall recently have strengthened, commodity prices are still depressed to the point where production expenses are not met. Therefore farmers continue to be in a negative net farm income situation. Farm operators are using up the equity in their land and machinery to continue very tight operating bases.

Att. 7 at 1.

The formal report of the Farm Credit Administration on the second quarter of 1982 confirmed the above descriptions. Due to record large corn, soybean and spring wheat crops, "crop commodity prices have been in a tailspin seeking new bottoms." Att. 4 at 1. Those large supplies, coupled with high interest rates, "suggest another year of declining farm income." *Id.* at 2.

Most of the remaining factors considered by the Secretary—such as loan to deposit ratios at rural banks, loan delinquency rates, availability of credit from private or other governmental lenders—are linked more directly to the Secretary's monitoring of credit conditions in the farm economy.[3] But here again, the information reviewed by the Secretary in this regard was almost uniformly negative, and contrary to the Secretary's decision.

---

**3.** The other remaining factors—whether a state was experiencing "abnormal economic stress" and the "overall health of agricultural credit"— are so broad as to include all the other factors, and so will not be discussed separately.

The Secretary himself recognized the gravity of the situation when, in a January 21, 1982 press release announcing the formation of his ad hoc advisory committee, he said that "many farmers are experiencing temporary credit and cash flow problems." Att. 1 at 1. A month later the American Bankers Association, in a letter to the Secretary, echoed this observation:

> The primary limiting factor on use of credit will be the debt servicing ability of farmers. At year-end 1981, financial statements show expected declines in net worth and deterioration in financial ratios. However, the biggest problem is the shortfall in cash flow resulting from negative net incomes. Many farmers cannot tighten their "credit" belts further.

Att. 5 at 1. The ABA warned that another year of low corn and soybean prices coupled with continuing high interest rates "will drive a large number of crop producers into a serious problem by this fall." *Id.* A few weeks later, in early March, 1982 the ABA submitted a more formal report to the Secretary, containing the following summary of its conclusions:

> In summary, the deteroriated financial condition of farmers is primarily due to low livestock and crop prices and in some areas, further aggravated by below average yields, combined with high interest rates, and continued high operating costs has broadly resulted in a negative net farm income. This has been accompanied by a general decrease in value of inventories and capital items resulting in a decline in net worth. The bankers are very concerned about the farm economy of 1982.

Att. 6 at 4.

By mid-year the farm credit market had not improved. In late May, 1982 the Farm Credit Administration submitted to the Secretary its report on the first quarter. It stated that the growth in the volume of agricultural lending had shown a "marked slowdown." Att. 3 at 2. The increases in renewals and refinancings indicated that some farmers were having difficulty repaying 1982 loans. *Id.* Delinquencies were up significantly, and there was also a "significant increase in the amount of time and effort required to work with borrowers to develop financial plans for 1982." *Id.* at 3. Rising interest rates were contributing to a "cost squeeze" on farm income. *Id.* The report concluded:

> Unless income conditions improve from current prospects, it is expected that the general trend in these statistics will continue and thus 1983 credit quality problems are a significant potential concern.

*Id.*

A few weeks later the American Bankers Association arrived at similar conclusions. In a letter to the Secretary dated June 15, 1982, the ABA noted that since the first meeting of the Secretary's ad hoc committee in January 1982, "agriculture's economic situation has not improved." Att. 7 at 1. Commodity prices remained depressed, and as a result, "commercial banks are very *concerned* about the financial health of their farm customers." *Id.* (emphasis in original). The ABA lamented that interest payments were taking up a large part of many farmers' operating budgets and concluded: "[F]armers can sustain for a period of time depressed commodity prices or high interest rates, but not both at the same time." *Id.*

The result of this financial stress was predictable. Throughout the year the Secretary received reports of growing numbers of delinquent loans and foreclosures. In March 1982 the Farm Credit Administration reported an increase in short and long-term loan delinquencies in the first month of 1982 over a year earlier. Att. 2 at 2. In February 1982 the American Bankers Association reported that delinquencies were "higher than one likes", although they did not then reflect a "crisis" situation. Att. 5 at 1. Still, the ABA noted that "because of current capital market conditions, there is effectively only one long-term lender (the Federal Land Bank) available to agriculture." *Id.* at 2. The equity farmers had in their land was already pledged to the hilt and producers were "highly leveraged." *Id.* The ABA warned that "lack of significant improvement in farm income will re-

sult in a substantial increase in [foreclosure] sales by next winter." *Id.*

Again, the picture remained the same through the spring. A briefing paper submitted to the Secretary on June 1, 1982 noted that delinquencies and foreclosures in some parts of the country had doubled or tripled. Att. 13 at 1. Even though the situation had not reached "crisis proportions", private lenders indicated that they were "very concerned about the trend." *Id.* The Farm Credit Administration's second quarter report to the Secretary noted a decline in delinquencies, but emphasized that it was only seasonal. Att. 4 at 2. Still, the FCA listed five states with delinquencies in FmHA loans ranging from 27 percent to 55 percent. The report concluded:

> On the surface, delinquency figures suggest that financial stress in agriculture eased somewhat between March 31 and June 30, 1982.... Closer study of delinquency data, however, and a review of loan liquidation statistics indicate that financial stress has not improved.

*Id.* at 3.

The only evidence submitted by the Secretary which might arguably support his determination is found in occasional statements, sprinkled through the various reports he considered, that rural banks had ample funds to lend to farmers. For example, a January 28, 1982 briefing paper prepared by the Secretary's staff said that agricultural banks were liquid—in other words, they had a relatively low loan to deposit ratio,—and consequently had ample funds for farm lending. Att. 12 at 3. *See also*, Board of Governors of the Federal Reserve System, *Agricultural Finance Databook* (December 1981, May 1982) (Atts. 8, 9); United States Department of Agriculture, *Financial Conditions in the Farm Sector* 1 (June 1, 1982) (Att. 13 at 1). However, rural banks enjoyed relatively low loan to deposit ratios not because they were flush with new deposits, but because economically strapped farmers had cut back on loan demand. The American Bankers Association reported to the Secretary in a March 5, 1982 letter that "[b]anks currently are relatively liquid with adequate funds available to meet the credit worthy demand of the farming sector." Att. 6 at 5. But the reason for this liquidity, explained the ABA, was "sluggish loan demand." *Id.* at 7. As the Secretary's staff explained to him in a June 1, 1982 briefing paper, the demand for intermediate and long-term credit had declined in 1982 because "[f]armers have cut back on purchases of machinery and equipment and other operating capital." Att. 13 at 1.

Each characterization of rural banks as relatively liquid was careful to point out, moreover, that funds were available for lending only to qualified or credit-worthy farmers. For example, the January and June, 1982 briefing papers considered by the Secretary state that "credit is available to qualified farmers" and "banks are liquid and have funds to lend to qualified borrowers." Att. 12 at 2; Att. 13 at 1. But the purpose of the economic emergency loan program was precisely to help those farmers who, because of their dire economic circumstances, could not qualify for private credit in the absence of a federal guarantee. Consequently, the availability of ample funds for qualified borrowers is irrelevant to a determination whether noncreditworthy farmers ought to be helped by the emergency loan program.

And as the Secretary's own briefing paper pointed out in January, 1982 "with higher interest rates and low farm income, fewer farmers will be able to qualify for credit." Att. 12 at 3. The same conclusion was echoed in the June 1982 briefing paper, which concluded:

> It is becoming more difficult for farmers to qualify for available credit. This year is expected to be the third consecutive year of low farm income, high interest rates, and declining real equity values.

Att. 12 at 5. In other words, the very class the Act was designed to protect grew larger in 1982.

In sum, of the factors purportedly considered by the Secretary, some are irrelevant to his decision—crop yields, and a state's share of national farm income. And the data underlying the other factors con-

sidered by the Secretary do not support his decision, but lead ineluctably to an opposite conclusion. Farm income was down, interest rates up, credit conditions tightened, delinquencies and foreclosures up. There is no evidence in the record to support the Secretary's decision. Plaintiffs are entitled to a declaratory judgment that the Secretary's action was arbitrary, capricious, and an abuse of discretion, and accordingly his decision shall be reversed.

Plaintiffs shall submit an appropriate proposed Judgment in accordance with the foregoing Memorandum within 10 days of the date of its filing.